BANK BRUSSELS LAMBERT, Swiss Bank Corporation, Banque Indosuez and Skopbank, Plaintiffs,

v.

CREDIT LYONNAIS (SUISSE) S.A. and Roy William Harris, a.k.a. William R. Harris, Defendants.

BANK BRUSSELS LAMBERT, Swiss Bank Corporation, Banque Indosuez and Skopbank, Plaintiffs,

v.

BANQUE PARIBAS (SUISSE) S.A. and Roy William Harris, a.k.a. William R. Harris, Defendants.

Nos. 93 Civ. 6876 (KMW), 94 Civ. 1317 (KMW).

United States District Court, S.D. New York.

Feb. 28, 1995.

Robert L. Weigel, Jerry J. Strochlic, Gibson, Dunn & Crutcher, New York City, for plaintiffs.

David Boies, Cravath, Swaine & Moore, New York City, for plaintiffs Swiss Bank Corp. and Bank Indosuez.

John F. Zulack, Flemming, Zulack & Williamson, Jed S. Rakoff, Fried, Frank, Harris, Schriver & Jacobson, New York City, for defendant Banque Paribas (Suisse) S.A.

Donald F. Luke, Rogers & Wells, New York City, for Credit Lyonnais (Suisse) S.A.

William R. Harris, Greenwich, CT, pro se.

### MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

These two consolidated cases involve claims of fraud and conversion arising out of the financing of an oil trading program. The plaintiffs, Bank Brussels Lambert ("BBL"), Swiss Bank Corporation ("Swiss Bank"), Banque Indosuez ("Indosuez"), and Skopbank, now move pursuant to Rule 26(c) of the Federal Rules of Civil Procedure for a protective order requiring defendants Credit Lyonnais (Suisse) S.A. ("Credit Lyonnais") and Banque Paribas (Suisse) S.A. ("Paribas") to return two purportedly privileged documents. These defendants have cross-moved

pursuant to Rules 26 and 37 for an order declaring that these two documents are not privileged and may be utilized in this litigation without restriction. The defendants seek a similar ruling with respect to two additional documents that were previously produced in discovery in redacted form. To determine these motions, it is necessary to apply principles of inadvertent disclosure and to utilize the common interest doctrine.

*Background* [1]

On January 1, 1990, the plaintiffs, together with the Chase Manhattan Bank, N.A. ("Chase") (the plaintiffs and Chase will be referred to collectively as the "Bank Group"), entered into a revolving credit agreement ("RCA") with Arochem Corporation and Arochem International, Inc. (collectively referred to as "Arochem"), two entities controlled by Roy William Harris, a.k.a. William R. Harris. The RCA provided a $235 million credit facility designed to provide funding for Arochem's purchase of crude oil and to permit it to establish "hedge" positions to protect against price fluctuation. The RCA limited Arochem's net open position to one million barrels and prohibited it from speculating or trading in oil for purposes other than hedging. As security for the RCA, the Bank Group perfected a security interest in Arochem's assets, including its accounts receivable.

Shortly after the RCA was entered into, Mr. Harris caused Arochem to begin open oil trading beyond the one million barrel limit, resulting in a deficit of $50 million in Arochem's net worth. Arochem disclosed none of this to the Bank Group. Instead, Mr. Harris established a new entity, Arochem International Ltd. ("Ltd."), as a vehicle for obtaining further financing. Defendants Credit Lyonnais and Paribas lent approximately $120 million and $100 million, respectively, to Ltd., which in turn used these monies to fund additional speculative trading by Arochem. Mr. Harris then transferred some $5 million to Credit Lyonnais and another $1.8 million to Paribas. According to the defendants, this was simply in partial

repayment of the loans they had extended. The plaintiffs, however, view this as conversion of Arochem's accounts receivable, in which the Bank Group held a security interest under the RCA.

In December 1992, Mr. Harris was convicted of conspiracy, bank fraud, wire fraud, and money laundering in connection with the activities of Arochem and Ltd. Thereafter, the plaintiffs filed the instant civil actions charging Mr. Harris, Credit Lyonnais, and Paribas with violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, as well as common law fraud and conversion.

Discovery disputes have arisen over production of the four documents at issue here. The first document is a draft letter prepared by the law firm of Coudert Brothers in October 1990 for Jack Seymour, a vice president of BBL (the "Coudert Letter"). The Coudert Letter was sent to Suzanne Durney, a vice president at Chase, and she circulated it among members of the Bank Group. During discovery plaintiffs' counsel identified this document as privileged, but it was nevertheless turned over to defendants' counsel in the course of document production.

The second document is a draft memorandum dated January 9, 1990, authored by Steven M. Cancro, who was then Associate Counsel of Banque Indosuez's New York branch (the "Cancro Memorandum"). This memorandum was addressed to two Indosuez employees and discussed legal advice provided by the firm of Weil, Gotshal & Manges, outside counsel to Banque Indosuez. Like the Coudert Letter, the Cancro Memorandum was designated as privileged by plaintiffs' counsel but was then produced during discovery in this case.

The two remaining documents were initially withheld as privileged but then produced in discovery in this case in redacted form. One is a memorandum dated October 26, 1990, from Sasha Dinell, a BBL employee, to that party's Credit Committee (the "Dinell Memorandum"). Redacted from this docu-

---

**1.** The facts set forth here are taken largely from the complaint and are included to provide a context for the discovery motions. No factual findings with respect to the merits of the litigation are intended.

ment was a one-sentence reference to legal advice. The other document is entitled "Credit Presentation" and is dated November 23, 1990 (the "Credit Presentation"). Again, a brief allusion to legal advice was redacted. However, unredacted copies of both documents were subsequently produced in discovery.

The plaintiffs move for a protective order declaring the Coudert Letter and the Cancro Memorandum to be privileged and precluding their use in this litigation. According to the plaintiffs, these documents are protected from disclosure by both the attorney-client privilege and the work product doctrine. The plaintiffs argue that the disclosure of these documents in discovery was inadvertent, and therefore did not constitute a waiver of any immunity from discovery. They further contend that the circulation of the Coudert Letter to Chase and other members of the Bank Group waived no privilege because these entities and BBL shared a common interest in the legal issues addressed. Defendants Credit Lyonnais and Paribas respond that the facts here do not support application of either the inadvertent disclosure doctrine or the common interest doctrine, and any claim of privilege as to these documents has therefore been waived.

These defendants cross-move for an order declaring that any privileges that might have been asserted as to the Dinell Memorandum and the Credit Presentation have likewise been lost. Again, the defendants argue that the inadvertent disclosure doctrine does not apply. With respect to the Dinell Memorandum, they also contend that the redacted portion reflects legal advice already shared among the Bank Group, so that any privilege has been waived on that basis as well.

A more detailed description of the basis for the claims of privilege and the circumstances of disclosure will be set forth in connection with the legal analysis below.

*Discussion*

### I.  *Attorney–Client Privilege*

■ The plaintiffs argue that all four documents at issue are protected by the attorney-client privilege. In federal courts, the choice of law rules for questions of privilege are set forth in Rule 501 of the Federal Rules of Evidence, which states in pertinent part:

> The privilege of a witness, person, government, State or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or subdivision thereof shall be determined in accordance with State law.

Here, the disputed documents constitute evidence related both to the federal RICO claims and to the pendent state claims, and privilege issues are therefore governed by federal common law. *See von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 141 (2d Cir.), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987); *PPM America, Inc. v. Marriott Corp.,* 152 F.R.D. 32, 34 (S.D.N.Y.1993); *Duttle v. Bandler & Kass,* 127 F.R.D. 46, 51–52 (S.D.N.Y.1989).

■ Federal courts continue to utilize the definition of the attorney-client privilege enunciated by Judge Wyzanski in *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950):

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

It is now well established that the privilege attaches not only to communications by the client to the attorney, but also to advice

rendered by the attorney to the client, at least to the extent that such advice may reflect confidential information conveyed by the client. *See In re Six Grand Jury Witnesses,* 979 F.2d 939, 943–44 (2d Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 2997, 125 L.Ed.2d 691 (1993); *National Broadcasting Co. v. U.S. Small Business Administration,* 836 F.Supp. 121, 125 (S.D.N.Y.1993); *Martin v. Valley National Bank,* 140 F.R.D. 291, 304 (S.D.N.Y.1991) (citations omitted).

Furthermore, the privilege protects from disclosure communications among corporate employees that reflect advice rendered by counsel to the corporation. *See In re Grand Jury 90–1,* 758 F.Supp. 1411, 1413 (D.Colo.1991); *In re Grand Jury Subpoenas Dated December 18, 1981 and January 4, 1982,* 561 F.Supp. 1247, 1258 (E.D.N.Y.1982). "A privileged communication should not lose its protection if an executive relays legal advice to another who shares responsibility for the subject matter underlying the consultation." *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 518 (D.Conn.) (citation omitted), *appeal dismissed,* 534 F.2d 1031, 1032 (2d Cir.1976). This follows from the recognition that since the decision-making power of the corporate client may be diffused among several employees, the dissemination of confidential communications to such persons does not defeat the privilege.

In light of these principles, the defendants do not dispute that the documents at issue satisfy all of the elements of the attorney-client privilege save one: whether the privilege has been waived. They argue that by producing the documents in this litigation or by sharing them with third-parties, the privilege has been forfeited.

## II. *Inadvertent Disclosure*

With respect to all four documents at issue, the defendants argue that any privilege was waived when plaintiffs' counsel turned over the documents during discovery in this action. The plaintiffs respond that the disclosure was unintentional, and that the documents should therefore continue to be treated as privileged.

As has often been observed, courts have taken three different approaches to the issue of inadvertent disclosure. Some courts hold that a disclosure that was not deliberate can never constitute a waiver of the attorney-client privilege. *See Georgetown Manor, Inc. v. Ethan Allen, Inc.,* 753 F.Supp. 936, 938 (S.D.Fla.1991); *Helman v. Murry's Steaks, Inc.,* 728 F.Supp. 1099, 1104 (D.Del. 1990); *In re Sealed Case,* 120 F.R.D. 66, 72 (N.D.Ill.1988); *Mendenhall v. Barber–Greene Co.,* 531 F.Supp. 951, 954 (N.D.Ill. 1982). The rationale behind this view is twofold. First, these courts reason that the privilege belongs to the client, so an act of the attorney cannot effect a waiver. *Helman,* 728 F.Supp. at 1104. Second, a "waiver" is by definition the intentional relinquishment of a known right, and the concept of an "inadvertent waiver" is therefore inherently contradictory. *Mendenhall,* 531 F.Supp. at 955.

There are several difficulties with this reasoning. Though the attorney-client privilege indeed belongs to the client, there are many such rights that may be forfeited by the attorney's negligence. For example, the very opportunity to bring an action can be lost by the attorney's failure to file within the statute of limitations, *see, e.g., Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 92–93, 96, 111 S.Ct. 453, 455–56, 457–58, 112 L.Ed.2d 435 (1990), and the right to appeal may be abandoned if the attorney neglects to file a notice on time. *See United States v. Hooper,* 9 F.3d 257, 259 (2d Cir.1993) ("excusable neglect" for attorney's failure to file timely notice of appeal judged by equitable standards). It would be anomalous to treat the attorney-client privilege as more personal to the client than these rights, which are case-dispositive. By the same token, objecting to the concept of "inadvertent waiver" as inherently contradictory is to substitute semantics for analysis. Implied waivers are frequently found where the party can hardly be said to have intended to abandon the privilege. *See, e.g., In re von Bulow,* 828 F.2d 94, 101 (2d Cir.1987). Finally, as a practical matter the "no waiver" rule minimizes the incentive for counsel to treat privileged documents carefully.

At the other extreme, some courts have held that the disclosure of a privileged docu-

ment necessarily constitutes a waiver of the privilege. *See Wichita Land & Cattle Co. v. American Federal Bank, F.S.B.,* 148 F.R.D. 456, 457 (D.D.C.1992); *Federal Deposit Insurance Corp. v. Singh,* 140 F.R.D. 252, 253 (D.Me.1992); *International Digital Systems Corp. v. Digital Equipment Corp.,* 120 F.R.D. 445, 449–50 (D.Mass.1988). These cases rely on the principle that "[o]ne cannot 'unring' a bell." *Singh,* 140 F.R.D. at 253. That is, once an attorney-client communication has been disclosed to a third-party, there is no way to restore its confidentiality. *See International Digital,* 120 F.R.D. at 449.

This rationale appears to assume that unless an attorney-client communication has been kept sacrosanct, there is no value to limiting its use or dissemination. But the privilege is not considered lost when the production of an attorney-client communication has been compelled in a prior action. *See Transamerica Computer Co. v. International Business Machines Corp.,* 573 F.2d 646, 651 (9th Cir.1978); *Rattner v. Netburn,* No. 88 Civ. 2080 (GLG), 1989 WL 223059, at *9, 1989 U.S. Dist. LEXIS 6876, at *27 (S.D.N.Y. June 20, 1989). Moreover, even when the privileged document has been disclosed to an adversary in the same action, whether the document can be introduced in evidence remains important to the litigant.

▪ The third approach to inadvertent disclosure does not take as doctrinaire a position as the others. Under this rule the privilege is waived with respect to mistakenly produced documents only if the producing party failed to take reasonable steps to maintain their confidentiality. *See Federal Deposit Insurance Corp. v. Marine Midland Realty Credit Corp.,* 138 F.R.D. 479, 482 (E.D.Va.1991); *Kansas City Power & Light Co. v. Pittsburg & Midway Coal Mining Co.,* 133 F.R.D. 171, 172 (D.Kan.1989); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103, 105 (S.D.N.Y.1985).

▪ This regimen best reconciles the principles underlying the attorney-client privilege with the realities of document production in complex litigation.

This rule is grounded in the notion that inadvertent disclosure is a species of waiv-

er and must be analyzed in that light. Waivers must typically be intentional or knowing acts. Inadvertent disclosures are, by definition, unintentional acts, but disclosures may occur under circumstances of such extreme or gross negligence as to warrant deeming the act of disclosure to be intentional.

*Marine Midland,* 138 F.R.D. at 482. Furthermore, the underlying purpose of the privilege is to encourage free communication between attorney and client. This rule fosters that goal by assuring the client that its confidences will not be publicly exposed because of a minor mistake by otherwise competent counsel. Such errors are, of course, inevitable in complex litigation involving the production of tens of thousands of documents. At the same time, the inadvertent disclosure doctrine creates an incentive for counsel to engage in production carefully, since the failure to take reasonable precautions will still result in waiver.

▪ Critics of the doctrine suggest that it is flawed because the fact of inadvertent disclosure in and of itself demonstrates that counsel failed to take adequate precautions. *See International Digital,* 120 F.R.D. at 449. But "reasonable" precautions are not necessarily foolproof. Just as a tort defendant who acts in a reasonably prudent manner avoids liability despite the occurrence of an accident, so an attorney who takes reasonable precautions in discovery may avoid waiver even though he inadvertently discloses a privileged document.

▪ Courts following this inadvertent disclosure doctrine engage in a multifactor analysis to judge whether counsel acted reasonably to safeguard the privilege or so recklessly that waiver should be implied. The elements considered include (1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the time taken to rectify any error, (3) the scope of discovery, (4) the extent of the disclosure, and (5) overriding issues of fairness. *See, e.g., Hydraflow, Inc. v. Enidine, Inc.,* 145 F.R.D. 626, 637 (W.D.N.Y.1993); *Marine Midland,* 138 F.R.D. at 482; *Lois Sportswear,* 104 F.R.D. at 105. This analysis may now be applied to the facts presented here.

**444**

The Coudert Letter and the Cancro Memorandum were originally among documents assembled by the law firm of Duker & Barrett in connection with an action brought in this court, *Chase Manhattan Bank v. Ernst & Young*, No. 93 Civ. 8270 (LMM) (the "Ernst & Young Action"), by the Bank Group against Ernst & Young, the former independent auditors of Arochem. *See* Declaration of Robert E. Malchman dated Nov. 11, 1994 at ¶ 2. All of the documents that Duker & Barrett collected were Bates-stamped by Milbank, Tweed, Hadley & McCloy ("Milbank"), counsel for the plaintiffs in that action. Malchman Decl. at ¶ 3. Milbank reviewed the documents and withdrew those that it considered non-responsive or privileged, including the Coudert Letter and the Cancro Memorandum. Malchman Decl. at ¶ 4.

The entire set of documents was then conveyed to Gibson, Dunn & Crutcher ("GD & C"), counsel for the plaintiffs in the instant actions, along with a list of the documents identified as non-responsive or privileged. In order to prepare these documents for production here, GD & C paralegals were instructed to remove all documents on the Milbank list and replace them with sheets of paper indicating the basis for declining to produce them. Malchman Decl. at ¶ 5; Declaration of Phyllis Cotrone dated Nov. 11, 1994 at ¶ 2.

GD & C produced more than 70,000 pages of documents on behalf of the plaintiffs. Among these were the Coudert Letter and the Cancro Memorandum, each of which was accompanied by a sheet indicating that the corresponding pages were privileged. Malchman Decl. at ¶ 8; Cotrone Decl. at ¶ 3; Affidavit of Alexander H. Schmidt dated Dec. 18, 1994 at ¶¶ 3, 4, & 5. Apparently, although GD & C paralegals had properly inserted the "privilege" designation, they had neglected to remove the documents themselves. Malchman Decl. at ¶ 8; Cotrone Decl. at ¶ 3.

When defendants' counsel received documents, they recognized the inconsistency between the apparent assertion of privilege and the production of the documents themselves. Accordingly, they wrote to plaintiffs' counsel seeking clarification. Malchman Decl., Exh. B. Having been unable to agree with plaintiffs' attorneys on the proper treatment of the documents, defendants' counsel wrote to the Court seeking leave to move for an order permitting the documents to be used in this litigation. In one such letter, defendants' counsel stated, "We also concluded that the document was probably produced to us unintentionally." Malchman Decl., Exh. B.

While the instant motion was pending, the Coudert Letter was produced to the defendants a second time. This occurred when defendants' counsel were reviewing original Indosuez and Swiss Bank documents in connection with the Ernst & Young Action, and this time there was no designation of privilege accompanying the document. Schmidt Aff. at ¶¶ 9, 10, 11.

This production took place pursuant to a court order requiring the plaintiffs in the Ernst & Young Action to produce original documents in the order in which they were maintained in the ordinary course of business. Affidavit of William F. Duker dated Jan. 5, 1995 at ¶¶ 6, 7. Accordingly, three attorneys at Duker & Barrett reviewed all of the documents, culling out those that were considered non-responsive or privileged. Duker Aff. at ¶ 8. After this process was completed, approximately 50,000 pages were made available for inspection. This retrieval, review, and production was completed in less than three weeks. Duker Aff. at ¶ 9. According to Duker & Barrett, production of the Coudert Letter was an oversight, possibly attributable to the fact that this letter was an attachment to a non-privileged document. Duker Aff. at ¶ 10.

The plaintiffs initially withheld as privileged three copies of the Dinell Memorandum. They later produced three copies in redacted form. However, in July or August of 1994, they also produced one unredacted copy to the defendants. Schmidt Aff. at ¶ 15. Similarly, the plaintiffs at first withheld the Credit Presentation in its entirety, but subsequently produced it in redacted form. They nevertheless produced to defendants an unredacted copy as well. Schmidt Aff. at ¶ 16. Once again, the plaintiffs contend that the unredacted copies of both documents were

produced inadvertently. Reply Declaration of Robert E. Malchman dated Jan. 6, 1995 at ¶ 3.

Finally, in questioning the precautions taken by plaintiffs' counsel, the defendants note that during the production of original documents in the Ernst & Young Action, the plaintiffs produced an entire box of privileged documents. Schmidt Aff. at ¶ 17. Counsel for the defendants alerted the Duker & Barrett law clerk, who removed the box. Affidavit of Jacqueline M. Allen dated Jan. 6, 1995 at ¶¶ 6, 7; Affidavit of Joseph Ayala dated Jan. 6, 1995 at ¶ 5. Defendants' counsel did not seek to have any documents from this box copied. Schmidt Aff. at ¶ 17; Allen Aff. at ¶ 8. The source of this mishap was apparently a paralegal who had been instructed not to deliver privileged or non-responsive documents which had been segregated in brightly-colored file folders and placed in separate boxes. Ayala Aff. at ¶ 3; Allen Aff. at ¶ 4. Nonetheless, of the fourteen boxes the paralegal delivered, one consisted of privileged documents. Ayala Aff. at ¶ 4; Allen Aff. at ¶ 5. This box did not contain any of the four documents at issue here. Allen Aff. at ¶ 5.[2]

In light of these facts, the first factor—the reasonableness of precautions taken by counsel—clearly favors the plaintiffs. In the production made by GD & C, paralegals were given clear instructions on how to match documents against the Milbank privilege list, how to remove the documents, and how to replace them with a sheet identifying the document as privileged. GD & C's reliance on Milbank's initial review was reasonable, and the adequacy of that review has not been called into question. Because the task for GD & C involved the culling of previously identified documents rather than a substantive privilege review, the use of paralegals was cost-effective and appropriate. Indeed, the clerical errors that led to disclosure might as easily have been made by an attorney as by a paralegal. The procedure of physically removing documents and replacing

them with a designation of privilege was well-designed and was preferable, for example, to the use of easily dislodged "post-its". *See International Digital,* 120 F.R.D. at 448.

Although less information has been provided about the redaction process, it too seems to have been conceived with sufficient care. Initially entire documents were withheld. Then, after there had been opportunity for further review by counsel, redacted copies were produced. This procedure permitted expeditious production of documents as to which there would be no question of privilege while at the same time allowing more considered review of documents potentially privileged in whole or in part. The erroneous production of unredacted copies of two documents again appears to be the result of clerical error.

Duker & Barrett's efforts were likewise reasonably cautious. Attorneys made a page-by-page review of the original documents before producing them in the Ernst & Young Action. Privileged documents were physically segregated and marked. An attorney evidently missed one copy of the Coudert Letter during this process. Then boxes of the documents were provided for inspection. Again, this task was appropriately delegated to a paralegal, though in this instance he mistakenly produced one box of privileged documents. The precautions taken by plaintiffs' counsel were nevertheless all that might be reasonably expected.

■■■ The second factor to be considered is the time taken by plaintiffs' counsel to rectify the error. Inordinate delay in claiming the privilege can prejudice the adversary and may be deemed a waiver. *See Baxter Travenol Laboratories, Inc. v. Abbott Laboratories,* 117 F.R.D. 119, 121 (N.D.Ill.1987). There was no such delay here. As soon as plaintiffs' counsel were alerted to the production of the Coudert Letter and the Cancro Memorandum, they asserted the privilege and sought the return of the documents.

---

**2.** Defendants' counsel have also submitted correspondence regarding Skopbank documents that were purportedly produced inadvertently by the law firm of Oppenheimer Wolff & Donnelly in related actions. Because the parties have not

developed the record concerning the circumstances of disclosure of these documents, it is not appropriate to consider them in connection with the instant motions.

Indeed, the documents themselves had been accompanied by a designation of privilege. Similarly, by producing redacted copies of the Dinell Memorandum and the Credit Presentation, the plaintiffs asserted privilege, and they were not advised of the production of unredacted copies until the defendants filed their cross-motion here.

The third factor, too, favors the plaintiffs. These cases are two of several related complex litigations. GD & C alone produced over 70,000 pages of documents. In the Ernst & Young Action, Duker & Barrett produced approximately 50,000 pages. The scope of discovery, then, is immense.

Compared to the volume of documents exchanged, the number of privileged documents erroneously disclosed was minuscule. Four specific documents were inadvertently produced, though the Coudert Letter was disclosed on two occasions. The box produced by Duker & Barrett in the Ernst & Young Action contained many more privileged documents, but under the circumstances of its disclosure, it should be counted as only a single event. Thus, inadvertent disclosure has occurred only to a minimal extent. *See Lois Sportswear,* 104 F.R.D. at 105 (disclosure of 22 documents out of 16,000 pages inspected held inadvertent).

■ Finally, denying the defendants the use of the documents at issue would in no way be unfair. The defendants have not suggested that the disclosure was selective such that they will be prejudiced unless more complete information is provided. Nor have they argued that they have already relied on the documents at issue. The defendants do contend that the Coudert Letter is a "smoking gun" that demonstrates the invalidity of certain of the plaintiffs' claims. But the relevance of a privileged document to the merits of the litigation does not make it unjust to withhold it from discovery. The prejudice factor focuses only on whether the act of restoring immunity to an inadvertently disclosed document would be unfair, not whether the privilege itself deprives parties of pertinent information. By these terms, there is no unfairness in precluding the defendants from using the documents at issue.

All of the relevant factors, then, militate in favor of holding that the disclosure to defendants' counsel of each of the four documents was inadvertent and therefore did not constitute a waiver of the privilege. Accordingly, I will proceed to address the issue of whether the privilege was nevertheless waived by disclosure to third-parties prior to the litigation.

### III. *Common Interest Doctrine*

The defendants contend that any privilege attaching to the Coudert Letter has been waived because it was circulated to other members of the Bank Group. Likewise, they argue that the redacted portion of the Dinell Memorandum reflects discussions among members of the Bank Group, thus waiving any privilege. The plaintiffs respond that the common interest doctrine precludes any finding of waiver.

The common interest doctrine subsumes a number of principles that are sometimes characterized as separate rules and are at other times conflated into a single axiom. *Compare Weil Ceramics & Glass, Inc. v. Work,* 110 F.R.D. 500, 502–03 (E.D.N.Y.1986) (distinguishing "common defense rule" from "community of interest rule") *with United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989) (joint defense privilege "more properly identified as the 'common interest rule'"). The nomenclature is less important than a determination of the boundaries of the doctrine.

■ At its core, "[t]he 'common interest' doctrine applies when multiple persons are represented by the same attorney. In that situation, communications made to the shared attorney to establish a defense strategy remain privileged as to the rest of the world." *North River Insurance Co. v. Philadelphia Reinsurance Corp.,* 797 F.Supp. 363, 366 (D.N.J.1992) (citations omitted). Some courts consider such dual representation situations to be the outer limit of the common interest doctrine. *See International Insurance Co. v. Newmont Mining Corp.,* 800 F.Supp. 1195, 1196–97 (S.D.N.Y.1992) (common interest doctrine inapplicable because no joint representation); *North River,* 797 F.Supp. at 367 ("the common interest doctrine is completely unleashed from its moor-

ings in traditional privilege law when it is held broadly to apply in contexts other than when there is dual representation").

Nevertheless, the weight of authority is that the common interest doctrine does extend at least to situations "where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Schwimmer*, 892 F.2d at 243. That is, the doctrine applies where parties are represented by separate counsel but engage in a common legal enterprise. Under such circumstances, it is not necessary for litigation to be in progress for the common interest doctrine to apply. *Id.* at 244. Although originally developed in the context of cooperation between codefendants in criminal cases, this extension of the doctrine is fully applicable to parties in civil cases as well. *See In re Bairnco Corp. Securities Litigation*, 148 F.R.D. 91, 102 (S.D.N.Y.1993); *Weil Ceramics*, 110 F.R.D. at 503.

More troublesome is the question of whether the doctrine can be stretched to apply to communications between entities that have parallel interests but are not actively pursuing a common legal strategy. In its most extreme form, this version of the common interest doctrine has been described as follows:

> A community of interest exists among different persons or separate corporations where they have an identical legal interest with respect to the subject matter of a communication between an attorney and a client concerning legal advice. The third parties receiving copies of the communication and claiming a community of interest may be distinct legal entities from the client receiving the legal advice and may be a non-party [sic] to any anticipated or pending litigation. The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial. The fact that there may be an overlap of a commercial and a legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest.

*Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1172 (D.S.C.1975). In prac-

tice, however, the *Duplan* court required more than merely concurrent legal interests. Although the court found that a communication with a non-party that was contractually obligated to be the party's legal patent advisor fell within the common interest doctrine, it held that disclosure to the exclusive licensee of the party's patent constituted a waiver. *Id.* at 1175.

The common interest doctrine, then, has both a theoretical and a practical component. In theory, the parties among whom privileged matter is shared must have a common legal, as opposed to commercial, interest. In practice, they must have demonstrated cooperation in formulating a common legal strategy.

Here, the plaintiffs argue that the common interest doctrine applies because the members of the Bank Group were jointly concerned about being drawn into litigation with Edwin E. Wells, Jr., an Arochem investor who had already brought suit against Mr. Harris. Malchman Decl. at ¶ 9; Declaration of Jack Seymour dated Nov. 12, 1994 at ¶ 2; Declaration of David A. Boillot dated Jan. 6, 1995 at ¶ 3. David A. Boillot, the attorney who drafted the Coudert Letter, states that one of his intentions was to address the concern that proposed transactions would lead Mr. Wells to sue BBL and other members of the Bank Group. Boillot Decl. at ¶ 3. Mr. Boillot contends that the members of the Bank Group "all shared a common interest in avoiding (though if necessary, defending) a lawsuit by Mr. Wells...." Boillot Decl. at ¶ 5. Accordingly, BBL provided a copy of the Coudert Letter to Suzanne Durney, a vice president at Chase, who in turn circulated it to other members of the Bank Group. Seymour Decl. at ¶ 3; Declaration of Suzanne Durney dated Nov. 11, 1994 at ¶ 2. Ultimately, Mr. Wells did sue the members of the Bank Group along with a variety of other defendants. Malchman Decl. at ¶ 10.

The difficulty with the plaintiffs' argument is that the common interest doctrine does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation. It is evident from the Coudert Letter itself that the

primary common interest that the members of the Bank Group were pursuing was whether Ltd. could (or should be permitted to) assume some of Arochem's obligations to the Bank Group. While each member shared a concern about the threat of shareholder litigation, there is no evidence that they formulated a joint legal strategy to deal with the possibility. Coudert Brothers, for example, represented only BBL and was not retained to represent the Bank Group as a whole or any of its other members. Nor is there any suggestion that counsel from that firm coordinated its legal efforts with attorneys for any other Bank Group member. Indeed, there is no indication that counsel were even present at the meeting where representatives of the Bank Group reviewed the Coudert Letter.

▮ In sum, BBL obtained an opinion letter from counsel concerning the viability of a potential transaction, and one of the issues addressed in that letter was possible litigation. In order to facilitate a joint business decision, BBL then disclosed that letter first to Chase and through Chase to other members of the Bank Group. In doing so, BBL waived any attorney-client privilege that would otherwise attach to the letter. In the absence of some evidence of a coordinated legal strategy, the presence of such a concern about litigation does not bring a disclosure within the common interest doctrine.

A similar result obtains with respect to the Dinell Memorandum. As a communication among non-attorney personnel of BBL, it would itself be privileged only to the extent that it incorporates privileged communications between attorney and client. The redacted portion, however, refers specifically to advice of counsel that was shared among members of the Bank Group. Defendants' Notice of Cross–Motion, Exh. 11. Because the common interest doctrine does not apply, this dissemination waived the privilege with respect to the advice referred to, and the Dinell Memorandum itself is therefore not privileged.

To summarize, the production in discovery of the four documents at issue did not constitute waiver of the attorney-client privilege because their disclosure was inadvertent. However, any privilege attaching to the Coudert Letter and the Dinell Memorandum was waived when the legal advice was shared with third-parties who were not pursuing a common legal strategy with BBL.

### IV. Work Product

▮ Notwithstanding waiver of the attorney-client privilege, the Coudert Letter and the Dinell Memorandum might still be protected from discovery by the work product doctrine because waiver principles applicable to the attorney-client privilege are not identical to those that apply to work product. Generally, disclosure to any third-party will constitute waiver of the attorney-client privilege. *See* 8 Charles A. Wright et al., *Federal Practice & Procedure* § 2016.2, at 238 (1994) ("waiver due to an interaction with one person ordinarily deprives the privilege-holder of the right to assert the privilege against anyone else"). By contrast, because the purpose of the work product doctrine is to prevent an adversary from taking advantage of an attorneys' preparation for litigation, waiver only occurs where disclosure to a third-party substantially increases the likelihood that the work product will fall into the hands of the adversary. *See id.* § 2024, at 367–69; *see also Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.*, 125 F.R.D. 578, 590 (N.D.N.Y.1989). Here, disclosure of the Coudert Letter or the Dinell Memorandum to the Bank Group would not have increased the probability that Mr. Wells, the presumed adversary, would obtain them, and therefore no waiver of work product protection occurred.

▮ However, it must still be determined whether these documents would be entitled to work product immunity in the first place. To qualify, they must have been prepared "in anticipation of litigation."

"The mere fact that litigation does eventually ensue does not, by itself, cloak materials" with work product immunity. The document must be prepared because of the prospect of litigation when the preparer faces an actual claim or potential claim following an actual event or series of

events that reasonably could result in litigation.

*National Union Fire Insurance Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir.1992) (citations and emphasis omitted). Some courts require that the probability of litigation be imminent. *See, e.g., Darnell v. McMurray*, 141 F.R.D. 433, 435 (W.D.Va. 1992); *Home Insurance Co. v. Ballenger Corp.*, 74 F.R.D. 93, 101 (N.D.Ga.1977). Others reject the element of temporal proximity but require that the primary motivating purpose behind the creation of the document have been to aid in possible future litigation. *See Redvanly v. NYNEX Corp.*, 152 F.R.D. 460, 465 (S.D.N.Y.1993); *Blockbuster Entertainment Corp. v. McComb Video, Inc.*, 145 F.R.D. 402, 404 (M.D.La.1992).

Here the documents do not qualify as work product under either standard. The "imminence" of any litigation is belied by the fact that although Mr. Wells did sue the members of the Bank Group, he did so a full four years after the Coudert Letter was created. Furthermore, the content of that document reveals that the purpose for its creation was not preparation for litigation, but furtherance of a business transaction. Such an opinion letter is not transformed into work product merely because it factors the possibility of litigation into the corporate decision. The same reasoning applies to the Dinell Memorandum, and these two documents are therefore subject to discovery.[3]

*Conclusion*

For the reasons set forth above, the plaintiffs' motion for a protective order pursuant to Rule 26(c) is granted and the defendants' cross-motion is denied to the extent that defendants Credit Lyonnais and Paribas shall return the Cancro Memorandum and the unredacted copy of the Credit Presentation and shall not use these documents or the information contained in them in any manner. The plaintiffs' motion is denied and the

defendants' cross-motion is granted to the extent that the Coudert Letter and the unredacted copy of the Dinell Memorandum may be used by Credit Lyonnais and Paribas in this action without limitation. In addition, because the motion papers of Credit Lyonnais and Paribas contain copies of material held to be privileged, these documents may be filed under seal with a redacted copy served on defendant Roy William Harris. No costs shall be assessed in connection with these motions.

SO ORDERED.

---

3. With respect to the Dinell Memorandum (and the Credit Presentation), the plaintiffs argue that the defendants' motion should be denied because they had not made a good faith effort to resolve this dispute prior to bringing it before the Court as required by Rule 37(a)(2)(A) of the Federal Rules of Civil Procedure and by S.D.N.Y.Civ.R. 3(f). But counsel had conferred with respect to the Coudert Letter and Cancro Memorandum as to which precisely the same legal issues were raised. Therefore, the purpose of Federal Civil Rule 37 and local rule 3(f) to eliminate unnecessary motion practice would not be furthered by requiring efforts at resolution that are destined to be futile.