McHugh, J.
In this case, two insurers, American Automobile Insurance Company (“American”) and Maryland Casualty Company (“Maryland”) seek to recover from defendant J.P. Noonan Transportation, Inc. (“Noonan”) by way of subrogation money American and Maryland (collectively the “Insurers”) paid on behalf of their insured, Community Service Stations, Inc. (“Community”) to settle pollution claims brought against Community. The Insurer’s claim that Noonan, a petroleum carrier, spilled some material on Community’s property and that that material migrated onto the property of Community’s abutters ultimately producing the claim the Insurers paid to settle.
Discovery now is proceeding. The Insurers have produced a substantial quantity of documents. Noonan, however, seeks some additional documents the Insurers have refused to produce on grounds that those documents are covered by one or more privileges. [1] Disagreeing, Noonan has filed the present motion to compel.

FACTUAL BACKGROUND

Like most disputes involving the applicability of a privilege, resolution of this one requires an awareness of the factual context in which it arises. Community has owned property at 79 Needham Street in Newton since 1929 and, until 1986, operated a bulk fuel oil storage facility and gasoline service station on the property.
Over the years, Community had at least two pollution-related problems. In 1974, Noonan allegedly spilled more than 1000 gallons of fuel onto Community’s property as well as the property of Community’s immediate neighbor, New England Concrete Pipe (“Concrete”). In 1986, leaks were found in underground storage tanks on Community’s properly as those tanks were being removed. Community remediated the site at cost of approximately $400,000, and its attorney, Saul Benowitz (“Benowitz”), sought to obtain reimbursement for the remediation costs from Community’s insurers. One of those insurers paid all the remediation costs except for a $10,000 deductible. American, from whom Community had purchased policies between 1985 and 1988, denied coverage and refused reimbursement.
The present issues arose in January of 1992 when Concrete notified Community that Community was responsible for some gasoline and fuel oil contamination of Concrete’s property. By the time Community received Concrete’s notice, Community was also aware that another neighbor, Boston Office Furniture ("Furniture”) also had discovered petroleum contamination on its property and believed that that contamination had come from Community.
To deal with the problems it realized it was facing, in January of 1992, Community hired the law firm of *494 Andersen & Krieger (“Andersen”) to represent its interests. It also hired an environmental consultant to provide an expert analysis that it might need to resist the claims it expected from Concrete and Furniture. Andersen and Benowitz also notified Community’s then-current and former insurers of the problems and sought from them financial assistance in their solution. In June 1992, Community received a formal claim notice from Concrete in the form of a letter of the type envisioned by G.L.c. 21E, §4A. Community received a similar notice from Furniture in January of 1993.
None of Community’s insurers enthusiastically leaped to its defense. Accordingly, in April 1992, Benowitz filed on Community’s behalf a declaratory judgment action against an insurer not involved in the present dispute seeking a judgment that that insurer was responsible for defense or clean — up costs. Benowitz added American as a defendant to that action in July of 1992. In August of 1992, one month after it was named a defendant in Community’s suit, American agreed to contribute up to $6000 to fund a groundwater flow study. In December of 1993, American agreed to pay 1 / 3 of Community's defense costs retroactive to January 1993 for the claim advanced by Furniture and retroactive to May of 1993 for the claim advanced by Concrete.
Up to this point, Maryland was not involved in Community’s declaratory-judgment action. In May of 1994, however, Community amended its action to add Maryland as a defendant. Shortly thereafter, Maryland and American agreed between themselves and with Community that each would fund 50% of Community’s defense costs retroactive to January of 1993 for the Furniture claim and to May of 1993 for the Concrete claim. In November of that year, Andersen negotiated a settlement of the Furniture claim. American and Maryland each agreed to pay 30% of the settlement and Community paid the balance.
Andersen then turned its attention to seeking a settlement with Concrete. By June 1995, Concrete had hired an environmental engineer to remediate contaminated areas on its property and had informed Community that remediation of the area it claimed Community had polluted would cost $335,000. Ultimately, in August 1995, Community settled with Concrete for $350,000, $75,000 of which came from Community itself, $166,666.67 of which came from American and $108,333.33 came from Maryland.
On or about July 5, 1994, some 13 months before Community arranged its settlement with Concrete, Andersen delivered to Noonan a letter of the type G.L.c. 21E, §4A envisions claiming that Noonan was responsible for the 1974 oil spill and its alleged consequences. On July 21, 1995, Andersen submitted to Noonan a second letter of the same tenor. On August 8, 1996, Andersen represented Community and the Insurers in a mediation with counsel for Noonan designed to resolve the claims Community had made. The mediation was unsuccessful and this action was filed on January 17, 1997. At that point, Andersen ceased its representation of Community and the Insurers with respect to the latter’s claims against Noonan.

THE DISCOVERY

During the course of discovery, Noonan made a series of document requests to which the Insurers responded. The requests and responses that currently divide the parties are as follows:
REQUESTS 5, 6. Complete copies of any and all claim files with respect to any claims submitted regarding any and all alleged contamination, at any time, at the property located at 79 Needham Street, Newton, Massachusetts, and/or 99 Needham Street, Newton, Massachusetts, pursuant to any and all policies of insurance issued by the plaintiffls], [American or Maryland] which provided liability and/or property insurance coverage for Community . . . Concrete . . . the property located at 79 Needham Street, Newton, Massachusetts, or the property located at 99 Needham Street, Newton, Massachusetts.
RESPONSES 5,6. [American and Maryland object] to this Request to the extent it seeks documents prepared in anticipation of litigation and/or protected from discovery by the attorney-client privilege, work product doctrine, joint defense privilege, or other privilege. Without waiving these objections, [American and Maryland state] that [they] will produce responsive, non-privileged portions of any such claims files which have not been previously produced.
REQUEST 10. Any written statement, signed or unsigned, by the plaintiff, [Community], its agents, servants, employees, adjusters and/or representatives, which refers or relates in any way to the property located at 99 Needham Street, Newton Massachusetts, the property located at 79 Need-ham Street, Newton, Massachusetts, the alleged contamination of either or both of these locations, the alleged cleanup or remediation efforts at either or both of these locations, or the claimed damages as described in the complaint.
RESPONSE 10. [American and Maryland object] to this Request to the extent it seeks discovery of documents prepared in anticipation of litigation and/or protected from production by the attorney-client privilege, work product doctrine, joint defense privilege, or other privilege. Without waiving its objections, [American and Maryland] will produce all responsive, non-privileged documents in [their] possession, custody or control which have not been previously produced.
REQUEST 13. Any and all documents which constitute, refer or relate to communications between *495 either or both of the plaintiffs, or anyone [on] their behalf and Community ... or anyone on its behalf.
RESPONSE 13. [American and Maryland] object to this Request to the extent it seeks discovery of documents prepared in anticipation of litigation and/or protected from discovery by the attorney-client privilege, work product doctrine, joint defense privilege, or other privilege. Moreover, [American and Maryland object] to this request on grounds that is overbroad and unduly burdensome, and that it seeks documents which are not relevant to any issue involved in this litigation and/or not reasonably calculated to lead to the discovery of admissible evidence.
REQUEST 21. Any and all documents which constitute, refer, or relate to reports and/or statements made by any investigators, agents, adjusters, employees and/or experts of the plaintiff which are in the possession, custody or control of the plaintiff and which relate in any way to the plaintiffs’ claimed damages and/or the alleged contamination as described in the complaint.
RESPONSE 21. [American and Maryland object] to this Request to the extent it seeks discovery of documents prepared in anticipation of litigation and/or protected from production by the attorney-client privilege, work product doctrine, joint defense privilege, or other privilege. Furthermore, [American and Maryland object] to this Request on the grounds that is beyond the scope of expert discovery as provided by Mass.R.Civ.P. 26(b)(4) to the extent it seeks documents which constitute, refer or relate to reports and/or statements made by experts who may have been retained by [American or Maryland]. Without waiving these objections, [American and Maryland) will produce all responsive, non-privilege documents in [their] possession, custody or control, with the exception of any responsive documents related to any experts [American or Maryland] may retain, and which have not been previously produced.
REQUEST 31. Complete copies of any an all adjuster’s reports regarding any and all alleged contamination, at any time, at the property located at 79 Needham Street, Newton, Massachusetts and/or the property located at 99 Needham Street, Newton, Massachusetts.
RESPONSE 31. [American and Maryland object] to this Request to the extent it seeks discovery of documents prepared in anticipation of litigation and/or protected from production by the attorney-client privilege, work product doctrine, joint defense privilege, or other privilege.
Those objections were met by the Insurers’ present motion to compel production of documents. Both sides have filed memoranda supporting their respective positions and, in addition, the Insurers have filed a “privilege log” (Paper No. 11) listing each document they have withheld and the grounds on which they have withheld it. That log contains six categories of documents:
1. Correspondence to or from Andersen from January 15, 1992 to the present concerning 79 and 99 Needham Street.
2. Correspondence to or from Benowitz from January 15, 1992 to the present concerning 79 and 99 Needham Street.
3. The Insurers’ claim files from February 4, 1992 to the present.
4. Communications between American and its counsel and between Maryland and its counsel.
5. Other work product.
6. Correspondence between American and Maryland. Each document appears to be covered by one or more of the requests quoted above. Rather than discuss the disputed documents by reference to numbered document requests, however, the parties have chosen to focus their discussion on each of the six categories just listed. I shall do likewise.
DISCUSSION A. CATEGORIES 1 AND 2
With respect to categories one and two, the Insurers make two related claims. First, they contend that, when this action began, they assumed the status of Community’s subrogees. As Community’s subrogees, they maintain, they have succeeded to all of Community’s rights. From that, it follows, they assert, that all of Andersen’s communications with the Insurers are the legal equivalent of Andersen’s communications with Community. Second, the Insurers claim that Andersen and Benowitz acted at all times as joint counsel to Community and to them and thus, wholly apart from any subrogation rights they may have obtained, communications between Andersen and themselves or between Benowitz and themselves are privileged under the attorney-client privilege.
1. Subrogation Rights
The Insurers’ contention that their status as Community’s subrogees means that Andersen’s and Benowitz’s communications with them are the functional equivalent of both lawyers’ communications with Community is unpersuasive and is unsupported by the principal cases on which they rely. Those cases are Dome Petroleum Limited v. Employers Mutual Liability Insurance Company of Wisconsin, 131 F.R.D. 63 (D.N.J. 1990), Central National Insurance Company v. Medical Protective Company, 107 F.R.D. 393 (E.D.Mo. 1985) and Southeastern Pennsylvania Transportation Authority v. Transit Casualty Co., 55 F.R.D. 553 (E.D.Pa. 1972). Each of those cases, however, involved a significantly different situation than this case presents.
*496 The basic principle at issue in each of the cases on which the Insurers rely was simply stated in Southeastern Pennsylvania Transportation Authority, supra, 55 F.R.D. at 557, in the following passage from 8 Wigmore, Evidence §2312 at 603-04 (McNaughton rev. 1961) that opinion quoted:
[W]hen the same attorney acts for two parties having a common interest, and each party communicates with him . . . the communications are clearly privileged from disclosure at the instance of a third person. Yet they are not privileged in a controversy between the two original parties, inasmuch as the common interest and employment forbade concealment by either from the other.
In each of the cases on which the Insurers rely, a third party had succeeded by way of subrogation to the rights of one of the parties who had the common interest. That succession, in the court’s view, gave the succeeding party the same right of access to the otherwise privileged communications the original party would have had. Subrogation thus was a sword the succeeding party used to gain access to communications accessible as of right to the party whose interests it succeeded.
Here, the Insurers seek to use subrogation not as the sword it was in the cited cases but as a shield to prevent Noonan’s discovery of the communications. But subrogation gives the subrogee no greater rights than the subrogor possessed. Subrogation, therefore, only produces the shield the Insurers desire if Community would have been able to shield the communications from disclosure on grounds of the attorney-client privilege before subrogation occurred. Community, in turn, would have been able to shield the communications only if they were privileged under some recognized theory. The Insurers’ subrogation rights, in sum, do not obliterate the distinction between Community and the Insurers. Instead, those rights allow the Insurers to assert whatever rights Community could have asserted had Noonan made the disputed requests to Community.[2]
2. Joint Defense or Common Interest Doctrine
Understanding the joint defense or common interest doctrine requires understanding the attorney — client privilege. The latter, of course, springs from the client’s need to communicate freely and confidentially with an attorney in order to obtain informed legal advice. Matter of a John Doe Grand Jury Investigation, 408 Mass. 480, 481-82 (1990). The burden of proving that the privilege exists is on the party who asserts it. Purcell v. District Attorney for the Suffolk Dist., 424 Mass. 109, 115 (1997). That burden encompasses not only an obligation to show the attorney-client relation, but also to show that (1) the communications were received from a client during the course of the client’s effort to obtain legal advice from the attorney in his or her capacity as an attorney, (2) the communications were made in confidence and (3) the privilege has not been waived. In the Matter of Reorganization of Electric Mutual Liability Insurance Company, 425 Mass. 419, 421 (1997); Colonial Gas Co. v. Aetna Cas. & Sur. Co., 144 F.R.D. 600, 604 (D.Mass. 1992); Resolution Trust Corp. v. Dean, 813 F.Sup. 1426, 1428 (D.Ariz. 1993) (”[i]n order to establish the applicability of the attorney-client privilege to a given communication, the party asserting the privilege must affirmatively demonstrate non-waiver of the privilege”). Because the privilege, like all others, has the potential effect of keeping relevant evidence from the fact finder, it is strictly construed. Commonwealth v. O’Brien, 377 Mass. 772, 775 (1979).
Properly understood, the joint defense or common-interest doctrine is a device designed to prevent waiver of the attorney — client privilege when discrete parties face the same legal claim. Early on, courts recognized that people faced with the same legal claim might have the same need to consult with attorneys representing those with common interests as they had to consult with their own attorneys. Chahoon v. Commonwealth, 62 Va. (21 Gratt.) 1036 (1871), one of the first cases to consider the issue, addressed it in the following fashion:
The parties were jointly indicted for a conspiracy. . . . They might have employed the same counsel, or they might have employed different counsel as they did. But whether they did the one thing or the other, the effect is the same, as to their right of communication to each and all of the counsel, and as to the privilege of such communication . . . They had a right, all the accused and their counsel, to consult together about the case and the defence, and it follows as a necessary consequence, that all the information, derived by and of the counsel from such consultation, is privileged.
Id. at 1043.
Chahoon still correctly states what has come to be known as the joint defense or common interest rule. Although the two may have slightly different characteristics, nomenclature is less important than establishing functional boundaries. Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 446 (S.D.N.Y. 1995). When two or more parties retain a common counsel, communications with that attorney are confidential and privileged as against all common adversaries. 2 Weinstein & Berger, Weinstein’s Evidence’s §503(b)[06] (1991). In addition, when defendants have engaged separate counsel who work together in a common defense, information exchanged between those counsel, or between the clients and the counsel, is privileged to the extent that the exchange is part of an ongoing and joint defense strategy. Eisenberg v. Gagnon, 766 F.2d 770, 787-88 (3rd Cir. 1985); United States v. McPartlin, 595 F.2d 1321, 1336 (7th Cir. 1979).
In the final analysis, the privilege prevents waiver of the attorney-client privilege through disclosures *497 between counsel or disclosures by clients to counsel bound together in pursuit of a common legal enterprise. Bank of Brussels Lambert v. Credit Lyonnais Suisse S.A., 160 F.R.D. 437, 446 (S.D.N.Y. 1995); In re LTV Securities Litigation, 89 F.R.D. 595, 604 (N.D.Tex. 1981). But a common pursuit of a common legal enterprise is the doctrine’s essential ingredient:
The common interest doctrine . . . has both a theoretical and a practical component. In theory, the parties among whom privileged matter is shared must have a common legal, as opposed to commercial, interest. In practice, they must have demonstrated cooperation in formulating a common légal strategy.
Bank of Brussels Lambert v. Credit Lyonnais Suisse S.A., supra, 160 F.R.D. at 447.
Massachusetts law, of course, strictly construes the attorney — client privilege. In the Matter of the Reorganization of Electric Mutual Liability Insurance Company, 425 Mass. 419, 421 (1997). Decided Massachusetts cases also recognize, however, the enormously important role the attorney — client privilege plays in insuring full, free and open communications between clients and their attorneys. In the Matter of a John Doe Grand Jury Investigation, 408 Mass. 480, 485 (1990). Moreover, the joint defense or common interest privilege is recognized in at least one leading Massachusetts evidence treatise. W.G. Young, et al., Evidence, 19 Mass. Prac. Series §503.2 at 262 — 63 (2d ed. 1998). In addition, the United States Court of Appeals for the First Circuit recognized the privilege in United States v. Bay State Ambulance and Hospital Rental Service, Inc., 874 F.2d 20, 28 (1st Cir. 1989) quoting In re Bevill, Bresler & Schulman ASSET Management Corp., 805 F.2d 120, 126 (3rd Cir. 1986).
At a time and in an age where transactions and the litigation they produce are increasingly complex, I am of the opinion that the joint defense or common interest components of the attorney-client privilege are necessary to ensure, as a practical matter, that clients receive the fully informed advice the attorney-client privilege is designed to produce. Individuals or entities with joint or common interests simply cannot obtain such advice if their attorneys must proceed in splendid isolation and are prohibited from interacting with others for the purpose of determining whether and to what extent common measures for preservation of common interests are available, feasible and agreeable to all who may have such interests. I am of the opinion, in sum, that the privilege is fully consistent with the principles upon which the attorney-client privilege rests in Massachusetts and, in fact, is part of Massachusetts common law.
Turning from discussion of principle to its application, it is true that American and Mutual had interests in common with Community from the moment the claims against Community first surfaced. It is also true, however, that until December of 1993, American, apart from contributing $6,000 toward a groundwater study, not only failed to consult with Community in a joint defense effort but was a defendant in an action Community commenced in order to produce the cooperative effort to which Community believed itself entitled. In December of 1993, American agreed to undertake at least some portion of the defense costs. From that point forward, American and Community had sufficient common interests to allow American the benefit of communications with Anderson if those communications were otherwise subject to the attorney-client privilege. The same can be said of Maryland as of the point in 1994 when Maryland and American each agreed to fund 50% of Community’s defense effort. Before that point, Maryland, too, not only was not engaged in preparing a joint strategy with Community but was on the opposite side of the versus sign in active litigation.
Pointing to several cases in which the privilege was found to exist even though those possessing the common interest also had intramural disputes, e.g., Eisenberg v. Gagnon, 766 F.2d 770 (3rd Cir. 1985), United States v. McPartlin, 59 F.2d 1321, 1336-37 (7th Cir. 1979), In re LTV Securities Litigation, 89 F.R.D. 595, 605 (N.D.Tex. 1981), the Insurers argue that their dispute with Community over coverage does not lessen the intensity of their common interest in opposing the claims advanced by Concrete and Furniture. In the Insurers’ view, therefore, that dispute should not adversely affect the existence or force of the privilege.
It is highly unlikely that any common or joint defense, at least in matters of some complexity, can proceed without some adjustment of differing interests. Indeed, joint consultations are likely to deal quite often with methods for adjusting those differing interests while maintaining a common front against the common opponent. If a joint defense or common interest privilege is to have any practical effect, therefore, it must survive exchanges in which the parties discuss and adjust those differing interests.
Recognizing that the privilege must be flexible enough to survive discussion of differing interests, however, is a far cry from saying that it survives litigation or differences so deep and profound that litigation is the likely outcome. The privilege, after all, is an extension of the attorney-client privilege and it is enormously difficult both as a matter of logic or policy to see why the privilege should extend to communications between adversaries engaged in, or about to begin, active litigation. In my view, the privilege simply does not extend that far.[3]
The upshot of all this is that American is entitled to the joint defense or common interest privilege for communications that occurred after December of 1993 when it agreed to pay a portion of the defense costs but not before. Maryland is entitled to the same privilege for communications that occurred after July *498 1994, when it agreed to pay a portion of the defense costs but not before.
The question thus becomes whether the Privilege Log contains sufficient information about each of the listed documents to show that the available joint defense or common-interest privilege applies. Because that privilege is simply an extension of the attorney-client privilege, it only applies to information provided by a client to a lawyer, although not necessarily the lawyer originating the letter, in confidence for the purpose of seeking legal advice. See generally Reorganization of Electric Mutual Liability Insurance Company, Ltd., 425 Mass. 419, 421 (1997). The Privilege Log lists the date of each document, the originator of the document, the addressee in the document and a very brief narrative statement about the document’s content. That information simply is not sufficient to determine whether the documents are covered by the attorney-client privilege. Because the Insurers bear the burden of showing that the privilege exists and because the Privilege Log fails to carry that burden, even those documents listed in Category 1 and Category 2 of the Privilege Log that are candidates for the joint defense or common interest privilege are in fact not covered by that privilege.
3. Work Product
In addition to claiming that the documents they exchanged with Andersen and Benowitz are covered by the joint defense or common-interest privilege, the Insurers maintain that they are also covered by the work-product privilege. Mass.R.Civ.P. 26(b)(3) provides that “a party may obtain discovery of documents . . . prepared in anticipation of litigation or for trial by or for another party or by or for that other party’s representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means.”
The “work product" doctrine embodied in Rule 26(b)(3) protects communications between an insurer and an insured, or material created by an insurer, if that material is prepared in anticipation of litigation or for trial. The test is whether, in light of the nature of the document and the factual context of the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. Meszar v. Horan, 10 Mass. L. Rptr. 682, 1999 WL 126280, *3 (Worcester Sup. Ct. 1999), citing Colonial Gas Co. v. Aetna Casualty & Surety Co., 144 F.R.D. 600, 605 (D.Mass. 1992). See also City of Worcester v. HCA Management Co., Inc., 839 F.Sup. 86, 88 (D.Mass. 1993).
In this case, litigation was a clear prospect from the moment of Andersen’s and Benowitz’s first communications with the Insurers. Both Furniture and Concrete had made claims for remediation and those claims prompted Community to engage Andersen. Indeed, the very first Andersen document at issue is a notice to Maryland of Concrete’s claim. The very first Benowitz document at issue is a notice to American of Concrete’s claim and a request for a defense. To be sure, at least insofar as the communications originating with Andersen and Benowitz are concerned, the privilege belongs to Community, not to the Insurers. As discussed earlier, however, the Insurers’ accession to Community’s rights by way of subrogation entitles them to claim that privilege. To the extent that litigation between Community and the Insurers came into focus, of course, documents the Insurers generated for purposes of their own litigation are entitled to the work — product privilege independent of any privilege by subrogation.
As stated earlier, the burden is on the claimant to show the existence of a privilege. Because the work-product privilege flows from the occasion and motive leading to the document’s creation and not the manner in which the author acquired the document’s content, however, the brief document descriptors contained in the Privilege Log, coupled with information about the date of origination, the originator and the addressee,' are sufficient to determine that many of the documents are, in fact, covered by work — product privilege. As to those covered documents, Noonan has not carried its burden of showing either a substantial need or the unavailability of comparable information from other sources. See generally Hull Municipal Lighting Plant v. Massachusetts Municipal Electric Co., 414 Mass. 609, 615 — 16 (1993). Those documents, therefore, need not be produced.
There remain a number of documents in Category 1 and Category 2 with respect to which information in the Privilege Log either is insufficient to establish a privilege or shows that no privilege exists. The Category 1 documents in that classification are: 2, 6, 9, 12, 16, 17, 18, 19, 20, 21, 30, 31, 46, 57 and 58. The Category 2 documents in that classification are: 12, 15, 27, 36 and 47. With respect to those documents, no privilege exists.
B. Category 3
Category 3 of the Privilege Log lists 64 documents comprising the Insurers’ claim file. The Insurers contend each of those documents was prepared in anticipation of litigation and thus is immune from discovery. In response, Noonan correctly notes that the motivating force for the document’s creation, and not simply the time when it was created, determines whether the privilege applies. Meszar v. Horan, supra, 10 Mass. L. Rptr. 682, 1999 WL 126280. As before, the Insurers must carry the burden of proving that the privilege applies. Again, however, as Community’s subrogees, the Insurers may claim any work-product privilege of their own or any work-privilege Community possessed.
*499 Based on my review of the Privilege Log, I am of the opinion that the Insurers have failed to sustain their burden of showing a litigation, as opposed to a business, motive for creating the following documents in Categoiy 3: 2, 4, 7, 13, 16, 17, 18, 27, 28 and 45. The privilege therefore does not apply to those documents but it does apply to the remainder.
C. CATEGORY 4
Category 4 documents in the Privilege Log consist of communications between American and Maryland and their respective counsel. On their face, those documents are protected by the attorney-client privilege and Noonan makes no claim to the contrary.
D. CATEGORY 5
Category 5 of the Log is labeled “other work product.” The Insurers list 19 documents in that category. Noonan challenges the classification of five, i.e., 1, 15, 16, 17 and 19. Documents 1 and 19, however, are Andersen’s work-product and the Insurers are entitled to claim a privilege with respect to those documents by way of subrogation, Document 15 was prepared in anticipation of litigation and Document 17 is covered by the joint defense or common-interest privilege. Document 16, on the face of it, is simply a letter enclosing a document destined for filing in court and, on this record, is attended by no privilege.
E. CATEGORY 6.
Finally, Categoiy 6 of the Log lists five documents that are manifestly correspondence between counsel for the insurers. Those documents are privileged under the joint defense or common-interest privilege.
ORDER
In light of the foregoing, it is hereby ORDERED that Noonan’s motion to compel production documents should be, and it hereby is allowed, with respect to the following documents listed on the Privilege Log as (A) Categoiy 1, Document Nos. 2, 6, 9, 12, 16, 17, 18, 19, 20, 21, 30, 31, 46, 57, 58, (B) Category 2, Document Nos. 12, 15, 27, 36, 47, (C) Category 3, Document Nos. 2, 4, 7, 13, 16, 17, 18, 27, 28, 45 and (D) Category 5, Document No. 16, and said motion should be, and it hereby is, otherwise DENIED.

Initially, the Insurers declined to produce more documents than currently are in dispute. Through discussions, Noonan and the Insurers resolved their differences with respect to the other documents subject, in some cases, to an agreement prohibiting disclosure of the produced documents to others or an agreement stating that production of some documents did not waive the Insurers’ right to assert available privileges with respect to other documents in the same category. I assume that the parties have entered the appropriate agreements or that they have agreed on the terms of appropriate orders for entry by the court. If that assumption is incorrect, they may file, pursuant to Superior Court Rule 9A, an appropriate motion designed to put the appropriate order or agreement in place.

The Insurers, of course, can always assert any privilege they possess in addition to privileges they acquired through subrogation. The force of their own rights is discussed below.

Recognition that the joint defense or common — interest privilege is an extension of the attorney-client privilege produces another, although more bound reason why the privüege does not extend to communications between adversaries. The attorney-client privilege covers only communications from the client to the lawyer designed to provide the client with legal advice. Communications between adversaries, whether they originate with lawyers or clients, are highly unlikely to fit that mold.