UNITED STATES of America, Plaintiff,

v.

**Ronald W. SKEDDLE, et al., Defendants.**

**No. 3:95CR736.**

United States District Court,
N.D. Ohio,
Western Division.

Oct. 1, 1997.

Robert William Kern, Office of the U.S. Atty., Cleveland, OH, Thomas A. Karol, Office of the U.S. Atty., Toledo, OH, for U.S., plaintiff.

Jon D. Richardson, Sr., Kaplan, Richardson, Rost & Helmick, Toledo, OH, William M. Connelly, Connelly, Soutar & Jackson, Toledo, OH, Peter R. Ginsberg, Gold & Wachtel, New York City, Robert Gold, Michael Sommer, McDermott, Will & Emery, New York City, for Ronald W. Skeddle, defendant.

Ronald W. Skeddle, Perrysburg, OH, pro se.

Sheldon S. Wittenberg, Wittenberg & Phillips, Toledo, OH, Stuart G. Nash, Brendan V. Sullivan, Jr., Barry S. Simon, Marcie R. Ziegler, Williams & Connolly, Washington, DC, for Darryl J. Costin, defendant.

Darryl J. Costin, Perrysburg, OH, pro se.

Jerome Phillips, Wittenberg & Phillips, Toledo, OH, Richard A. Hibey, Gordon A. Coffee, Michael K. Atkinson, Douglas N. Greensburg, Winston & Strawn, Washington, DC, for Edward B. Bryant, defendant.

Edward B. Bryant, Toledo, OH, pro se.

Gerald Arthur Messerman, Messerman & Messerman, Cleveland, OH, for David L. Herzer, defendant.

David L. Herzer, Vermilion, OH, pro se.

Niki Z. Schwartz, Gold, Rotatori, Schwartz & Gibbons, Cleveland, OH, John E. Martindale, Martindale, Bryztwa & Quick, Cleveland, OH, for Joseph G. Corsaro, defendant.

Joseph G. Corsaro, Bay Village, OH, pro se.

John J. Callahan, Toledo, OH, for John R. Purser, defendant.

John R. Purser, Whitehouse, OH, pro se.

John Czarnecki, Cooper, Walinski & Cramer, Toledo, OH, for Clarence H. Martin, aka, Red Martin, Red Martin, defendant.

Clarence H. Martin, Gahanna, OH, pro se.

J. Michael Murray, Berkman, Gordon, Murray, Palda & DeVan, Cleveland, OH, for David M. Hobe, defendant.

David M. Hobe, Strongsville, OH, pro se.

Norman G. Zemmelman, Britz & Zemmelman, Toledo, OH, Sander Schwartz, Cook, Riley, Smith, Nance & Schwartz, Cleveland, OH, Richard G. Lillie, Lillie & Holderman, Cleveland, OH, for Floyd A. Trouten, III, defendant.

Floyd A. Trouten, III, Strongsville, OH, pro se.

## Order

CARR, District Judge.

This is a criminal action in which defendants are charged with mail and wire fraud, money laundering and conspiracy. Pending is a motion by intervening party Libbey–Owens–Ford Company (LOF) for an order in limine regarding cross-examination into matters protected by the attorney-client privilege. (Doc. 733). Defendants Skeddle, Costin and Bryant have filed a memorandum in opposition, (Doc. 699) and LOF has filed a reply. (Doc. 704). For the following reasons, the motion shall be granted in part and denied in part.

### Background

Intervenor LOF is the former employer of defendants Skeddle, Costin and Bryant, who, along with their alleged co-conspirators, are charged with defrauding LOF of millions of dollars. Alan Miller, the government's first witness, is, and, at all times relevant to this criminal action, has been LOF's General Counsel.

Prior to May, 1993, Miller communicated variously with Skeddle, Costin and Bryant concerning the three allegedly fraudulent transactions that underlie the criminal charges in the indictment.[1] Sometime in

---

1. The government charges that the defendants defrauded LOF through three distinct schemes. The first transaction involves the outsourcing of LOF's computer department to Computer Technology Management, a company in which the defendants had an undisclosed interest. In the second transaction, defendants allegedly used rigged bids to cause LOF to sell gas wells to a company owned by defendants for a price less than market value. The final transaction at issue concerns an agreement entered into by LOF to lease robotics equipment from Flexible Automation Systems, whereby defendants anticipated enriching themselves at LOF's expense.

April, 1993, Miller became suspicious of the activities of the defendants Skeddle, Costin and Bryant and began an internal investigation into the three transactions. In connection with this investigation, Miller retained the law firm of Squire, Sanders & Dempsey (SSD) to represent LOF. By the end of May, 1993, LOF had begun civil litigation against its former employees and others. Before and during that litigation, which has been stayed pending completion of this case, Miller discussed and continues to discuss with attorneys at SSD and management at LOF the events surrounding the suspect transactions.

In connection with Miller's trial testimony in this criminal case, LOF agreed to waive its attorney-client privilege as to communications between Miller (and presumably its other in house attorneys) and LOF management prior to Miller's discovery and internal investigation of defendants' allegedly fraudulent activities. LOF has refused, however, to waive its privilege as to communications related to its internal investigation of and litigation against the defendants.

Defendants claim LOF has waived the attorney-client privilege through voluntary disclosure of privileged communications. Specifically, defendants argue that LOF's production of certain documents to the government (which were then produced to defendants) and Miller's testimony regarding conversations with LOF management before May 10, 1993 (the date on which defendants Skeddle, Costin and Bryant were suspended by LOF) waive any privilege that LOF might have otherwise have had as to communications after this time, because the later communications are on the same subject matter.

## Discussion

▆▆▆▆ The Sixth Circuit has held that: (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived. *Fausek v. White*, 965 F.2d 126, 129 (6th Cir.1992) Voluntary disclosure of privileged communications is inconsistent with an assertion of the attorney-client privilege. *In re Grand Jury Proceedings*, 78 F.3d 251, 254 (6th Cir.1996) (*citing Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1424 (3d Cir.1991)). Indeed, it is well-established that when a party reveals specific privileged communications, that party waives the privilege as to all communications on the same subject matter. *In re Grand Jury Proceedings*, 78 F.3d at 255 (citations omitted).

The evil sought to be avoided by the "same subject matter" test is the selective and calculated disclosure of privileged communications. *See Chinnici v. Central DuPage Hosp. Assoc.*, 136 F.R.D. 464, 465 (N.D.Ill. 1991) (parties cannot be allowed selectively to divulge privileged information without risking loss of privilege as to the rest of that information); *Teachers Ins. and Annuity Ass'n of America v. Shamrock Broadcasting Co.*, 521 F.Supp. 638, 641 (S.D.N.Y.1981) ("when a party discloses part of an otherwise privileged communication, he must in fairness disclose the entire communication, or at least so much of it as will make the disclosure complete and not misleadingly one-sided").

As a general rule, waiver of the privilege with regard to some communications waives the privilege as to all other communications relating to the "same subject matter." *In re Grand Jury Proceedings*, 78 F.3d at 255–256; *United States v. Mendelsohn*, 896 F.2d 1183, 1189 (9th Cir.1990). This rule seeks to avoid the unfairness that might result from selective disclosure while, at the same time, upholding the privilege and preserving the interests it protects from excessive exposure.

Despite the centrality of the term, "same subject matter," to this inquiry, courts have not defined its meaning and content precisely. Aside from a general instruction to construe "same subject matter" narrowly,[2] no

---

**2.** Realizing that fairness is at the heart of the waiver issue, courts have generally held that the "same subject matter" is to be viewed narrowly. *See Fujisawa Pharm. Co., Ltd. v. Kapoor*, 162 F.R.D. 539, 541 (N.D.Ill.1995) (if subject of plaintiff's attorney's testimony was limited to discrete issue, plaintiff could limit its subject matter waiver to that issue); *McCormick–Morgan, Inc. v.*

guidance has been given about how a trial court is to determine what is and what is not within the same subject matter when disclosure of some privileged communications has taken place.

■ Among the factors which appear to be pertinent in determining whether disclosed and undisclosed communications relate to the same subject matter are: 1) the general nature of the lawyer's assignment; 2) the extent to which the lawyer's activities in fulfilling that assignment are undifferentiated and unitary or are distinct and severable; 3) the extent to which the disclosed and undisclosed communications share, or do not share, a common nexus with a distinct activity; 4) the circumstances in and purposes for which disclosure originally was made; 5) the circumstances in and purposes for which further disclosure is sought; 6) the risks to the interests protected by the privilege if further disclosure were to occur; and 7) the prejudice which might result if disclosure were not to occur. By applying these factors, and such other factors as may appear appropriate, a court may be able to comply with the mandate that it construe "same subject matter" narrowly while accommodating fundamental fairness.

■ Applying the factors outlined above, I find that LOF has not waived its privilege as to communications after late April, 1993. Mr. Miller's involvement and interest in the

three transactions at issue can be divided into three distinct phases. An "implementation" phase lasted from late 1990 until April, 1993. During this period, LOF's legal department communicated with company management about the negotiation, implementation, and progress of the CTM, gas wells, and FAS contracts.

A second, or "investigatory," stage began once LOF had significant reason to believe that misconduct had occurred. The triggering event for this phase was a telephone conversation on April 30, 1993, between Mr. Miller, Mark MacGuidwin, LOF's Chief Financial Officer, and Bruce Wyre, director of LOF's purchasing department. In that call, LOF learned that the defendants Skeddle, Costin and Bryant may have engaged in undisclosed self-dealing at LOF's expense.[3] The third, or litigation, phase, commenced sometime in May, 1993, when LOF decided to file suit to recover the money and property believed by it to have been obtained fraudulently by the defendants.

Through Miller's testimony, LOF has willingly disclosed communications between its in house counsel and LOF management concerning the negotiation of the CTM, gas wells, and FAS contracts. LOF has agreed, as it must, that this disclosure constitutes a complete waiver of the attorney-client privilege as to communications relating to the

---

*Teledyne Ind., Inc.,* 134 F.R.D. 275 (N.D.Cal. 1991) (too broad a definition of scope of waiver would "completely eviscerat[e] the concept of 'subject matter' waiver and offend[ ] the law's mandate to construe the scope of a waiver narrowly)."

In *In re Grand Jury Proceedings,* the Sixth Circuit adopted this narrow view of the "same subject matter." In that case, an attorney's privileged advice concerning one element of a marketing plan was disclosed to third parties. Explicitly recognizing that "subject matter can be defined narrowly or broadly," 78 F.3d at 255–56, the Court held:

> [W]e do not believe that the owner and president's waiver of the privilege by divulging the attorney's advice on several specific items of the marketing plan necessarily constitutes waiver as to the attorney's advice on the entire plan. We are thus persuaded by the line of cases that try to make prudential distinctions between what was revealed and what remains privileged.

The Sixth Circuit ultimately reversed the district court's blanket conclusion that the defendant could ask any questions at all about the attorney's advice on the marketing plan and remanded the case, cautioning that the district court might have to decide discrete issues of privilege on a question-by-question basis. *Id.* Additionally, the Court noted that the ultimate determinations of privilege would have to be guided by fairness concerns. *Id.*

3. In an oral opinion, announced from the bench, I concluded that there was a discovery phase that ended on May 10, 1993, and an ensuing investigatory phase thereafter. On further consideration, I believe that all activities by LOF commencing with a phone conversation on April 30, 1993, between Miller and the director of LOF's purchasing department, Bruce Wyre, properly are viewed as being within an investigatory phase which commenced following the April 30, 1993, phone conversation between Miller, MacGuidwin, and Wyre.

negotiation and implementation of those three transactions.

Disclosing information discussed and documents developed during the implementation phase by allowing Miller to testify does not, however, automatically waive LOF's attorney-client privilege as to communications made during the investigatory and litigation stages. During the earlier period, Miller was representing LOF in the formation and implementation of business arrangements that were, so far as he knew, of an entirely conventional sort. Once the defendants' self-dealing became known, however, Miller was acting to protect LOF's interests from apparent wrongdoing by its own officers.

During each of these phases, therefore, the general nature of Miller's responsibilities differed, and his activities during each phase were distinct. The purpose of his work and circumstances in which he was working and acting as LOF's counsel likewise differed significantly. During the implementation phase Miller was working at Skeddle's behest and with Costin and Bryant to achieve the corporate goals of outsourcing, asset divestiture, and downsizing. Thereafter, Miller was working to remove the cloak of concealment with which the defendants had kept their self-dealing hidden. Finally, during the litigation phase, Miller has acted in a thoroughly adversary capacity vis-a-vis the defendants in an effort to obtain the relief demanded in the arbitration and two civil suits.

If waiver of the privilege with regard to communications during the implementation phase were to lead to waiver with regard to communications during the investigatory and litigation phases, the interests protected by the attorney-client privilege would be placed at considerable risk. On the other hand, the risk of prejudice to the defendants from

limiting the waiver to communications during the implementation phase appears nonexistent. Given the distinctive character of both Miller's activities and the lack of nexus between the earlier and the later communications, there is no basis for concern that disclosure only of communications occurring before discovery of the alleged frauds is unfairly selective. By asserting the privilege with regard to communications after the implementation phase, LOF is not simultaneously using that claim as a sword and shield.

I decline, accordingly, to extend LOF's waiver to communications made in connection with investigation of or litigation relating to the self-dealing transactions. Miller's testimony and disclosures as to LOF's communications while negotiating and implementing the CTM, gas wells, and FAS contracts do not, therefore, automatically waive LOF's privilege as to communications during the later discovery and investigatory stages.

Despite my refusal to find that the attorney-client privilege has been waived as to all communications during the investigatory and litigation periods, I must still examine the extent to which disclosure of some privileged materials created during the investigation and litigation phases waives the privilege as to matters referenced in those documents. This requires consideration of six exhibits attached to the defendants' response to LOF's motion in limine (Doc. 669).

■ Exhibit A is a chronology of the FAS transaction prepared by Miller and dated March 9, 1995.[4] Included in the chronology are references to two discussions that Miller had with a Mr. Hansell and Mr. Wyre on December 1, 1994.[5] Because these otherwise

---

4. According to Miller's trial testimony, this chronology was created at various times by supplementation as he added new information or dates. It does not appear that the chronology was edited, in the sense that entries were deleted as it was being composed. Instead, it appears that Miller would up-date the chronology as time passed.

5. That chronology states:
March 22 Per discussion with Hansel 12/1/94 his suggestion re Honeywell was very "offhand" and he was surprised to see it in the minutes.

At that point he had not heard of Martin or FAS doing a deal with LOF and did not hear it until the meeting when Bryant announced a contract had been signed.
Per discussion with Wyre 12/1/94 he was at this meeting. When Hansell made the Honeywell suggestion innocently, Bryant seized on it. At this point Wyre knew they were cooking up the robotics deal, as Wyre had been approached by Bryant in December over the holidays.
Doc. 699, Exh. A.

privileged conversations occurred during the litigation phase, the attorney-client privilege with respect to their subject matter has been waived by LOF's disclosure of these conversations.

 When those conversations were disclosed, Miller was, apparently, still investigating the background of the FAS transaction. I find that the conversations between Miller and Hansell and Miller and Wyre relate to a distinct subject: namely, Hansell's and Wyre's reactions to the response of others at the meeting to Hansell's reference to "the Honeywell deal." If Miller had further conversations with Hansell or Wyre about their reactions at that meeting to the response of those other participants, such conversations are not protected by the attorney-client privilege, as they involve the same subject matter as the disclosed conversation. The disclosed statements by Hansell and Wyre relate, however, only to their reactions to the responses of others; those statements have no nexus with the other matters discussed at the December 1, 1994, meeting. The privilege has not been waived, accordingly, with regard to any such other matters.[6]

 Exhibit B contains the notes of Mr. Glass, dated April 30, 1993 through May 4, 1993, which recite conversations between various LOF officials during that period. The notes appear to be a chronology, like Miller's chronology of the FAS transaction: they reflect Mr. Glass's understanding of events and how he came to acquire that understanding. The "subject matter" of the notes is not the events to which they refer; the subject matter is, rather, Glass's understanding and how it was acquired. The privilege has been waived with regard to the

notes, but not with regard to the underlying conversations and events reported therein. Those matters are distinct from their chronological recitation by Mr. Glass.

No prejudice results to the defendants if their use of the notes is limited—with reference to the claim of attorney-client privilege—to the general subject of Glass's understanding and how it was obtained. His recitation of statements by others is hearsay, and not admissible in any event for the truth of the matters asserted. If, on the other hand, disclosure of the notes exposed every otherwise privileged communication as to the matters referenced in the Glass memo, the privilege would be withdrawn from dozens, if not hundreds of communications as to which all participants had expected confidentiality. Interests protected by the privilege would be placed in great jeopardy if the subject matter of the Glass notes were deemed to be every topic mentioned in those notes.

Likewise, LOF's disclosure of Exhibit C, notes of Mr. McGuidwin prepared in late April, 1993, waives LOF's privilege as to the notes themselves. They are, however, similar to the Glass and Miller chronologies, and other communications about the subjects mentioned therein remain privileged.

 Exhibit D is a letter dated March 24, 1994, from LOF's outside counsel, David Alexander, to Mr. Woods, an attorney for LOF's directors and officers liability insurer. Because there is no attorney-client relationship between Mr. Alexander and Mr. Woods, the letter itself is not privileged.[7]

Mr. Alexander's letter sets forth LOF's basis for an insurance claim arising from defendants' alleged misconduct. It does not disclose any attorney-client communications between Mr. Alexander and LOF, although

---

6. During cross-examination, the FAS chronology was admitted into evidence without objection. During redirect examination, the government had Miller read the two paragraphs quoted in the preceding footnote. Thereafter, a hearsay objection was upheld. Counsel for defendant Costin renewed his claim that Miller's testimony waived the claim of privilege with regard to FAS-related communications. That contention is overruled for the same reasons that I overrule the claim of waiver based on disclosure of the FAS memorandum.

7. In a separate order, I have found that publication of a statement by an attorney does not waive the work product privilege for any notes, memoranda, interviews, research, or other related materials underlying that statement. *See* Order Granting Intervenor LOF's Motion to Quash Trial Subpoena, filed September 29, 1997. Thus, the disclosure of Mr. Alexander's letter does not waive the work product privilege as to any underlying materials he relied on in writing that letter.

such communications undoubtedly underlie his conclusions in the letter. Allowing defendants to discover or inquire into such privileged communications merely because they formed the basis for a disclosed opinion would undermine substantially, if not completely, the purpose of the attorney-client privilege. Requiring such disclosure would permit discovery of underlying privileged communications whenever an attorney states an opinion based on such communications. Such broad waiver runs counter to the protection generally afforded the attorney-client relationship.

As to Exhibits E and F, I find that LOF has waived its privilege only with regard to the particular document disclosed. Exhibit E attaches Mr. Wyre's notes, dated June 2, 1993, setting forth a chronology of meetings on the FAS transaction. As such, this exhibit is similar to the Miller, Glass, and McGuidwin chronologies. Communications relating to the underlying events remain protected under the attorney-client privilege.

 Exhibit F is an analysis of the costs of the CTM transaction prepared by Miller on February 27, 1995. To the extent this analysis derives from attorney-client communications, its disclosure does not waive the privilege as to such communications. If, however, other, inconsistent analyses by Miller exist, LOF should not, in the interest of fairness, be permitted to object to their disclosure. Otherwise the shield of the privilege will be a sword in the hands of the defendants' adversaries. The "subject matter" is Miller's analysis; if he produced other analyses for LOF, it, in turn, should provide them pursuant to the subpoena to do so.

In light of the foregoing, it is hereby

**ORDERED THAT** intervenor LOF's motion in limine re. cross-examination into matters protected by the attorney-client privilege shall be, and hereby is, granted in part and denied in part as provided herein.

**So ordered.**