**LIBBEY GLASS, INC., Plaintiff,**

v.

**ONEIDA, LTD., Defendant.**

No. 3:98CV7439.

United States District Court,
N.D. Ohio,
Western Division.

March 16, 1999.

Steven R. Smith, Reginald S. Jackson, Jr., Connelly, Jackson & Collier, Toledo, OH, Douglas A. Freedman, Kenneth G. Schuler, David S. Foster, Kevin C. May, Amy J. Kappeler, Elizabeth Opper Kraemer, Latham & Watkins, Chicago, IL, for plaintiff.

Richard M. Kerger, Daniel F. Marinik, Kerger & Kerger, Toledo, OH, John Gueli, Antoinette E. Baker, Ellen R. Wiseman, Alexander Min Sung Kim, Shearman & Sterling, Steven M. Betensky, Adam Chernichaw, John Paul Reiner, White & Case, New York City, for defendants.

## ORDER

CARR, District Judge.

This is a trade dress case in which the parties dispute demands for discovery by the plaintiff, Libbey Glass, Inc. (Libbey). The defendant, Oneida, Ltd. (Oneida), opposes the demands. Following submission of letter briefs and a telephone conference, the issues raised by Libbey are decisional.

### Background

The gravamen of Libbey's complaint is that Pasabahce Cam Sanayii VE Ticaret A.S. (Pasabahce) is making, and Oneida is selling, glassware that is duplicative of seven of Libbey's best-selling patterns.

Resolution of the pending discovery dispute requires an understanding of the relationship between Oneida, Pasabahce, and Norbert Ullman, a middleman in the dealings between Oneida and Pasabahce. Oneida is a major supplier of flatware and tableware to the foodservice industry (i.e., restaurants, hotels, and other institutional users of glassware). Oneida is undertaking to increase its presence in the market by offering glassware as well.

To attract customers, including customers who have purchased or may purchase glassware from Libbey (which historically has had the largest market share), Oneida has contracted with Pasabahce, a Turkish manufacturer of glassware, to purchase several lines of glassware. Among the lines to be supplied by Pasabahce to Oneida are seven styles that Libbey claims are duplicative of its most popular glassware lines.

Ullmann, a citizen and resident of the Federal Republic of Germany, appears to have played an important role in the development of the present supplier/purchaser relationship between Oneida and Pasabahce. The parties dispute the legal consequences of that role and Ullmann's relationship with Oneida. Libbey claims that Ullmann is and has been a "managing agent" of Oneida as that term is used in Fed.R.Civ.P. 30(b). If so, he may be produced for deposition in this country. Oneida, pointing to a series of contracts it has had with Ullmann since 1991, contends that Ullmann is an independent contrac-

tor/consultant. If so, he can be deposed only through the procedures established by the Hague Convention. Resolution of this aspect of the parties' dispute requires examination of the Oneida–Ullmann contracts.

Pursuant to these contracts, Ullmann first served as a consultant to procure crystal. He next served as a consultant to develop European markets for Oneida's products. Most recently and currently, he once again serves as a consultant to procure crystal and, as well, "common glassware," which is the type of glassware that is the subject of this litigation.

In its first contract with Ullmann, dated September, 15, 1991, Oneida retained Ullmann "to perform certain advice and counsel on behalf of Oneida in the procurement of crystal products." (Doc. 86, Exh. A). In the second contract, entered into on February 28, 1995, Oneida retained Ullmann to assist Oneida in the "European market" with "development of new marketing and distribution channels for its product [sic]." (*Id.* Exh. B).

The final and current Oneida–Ullman contract was entered into on November 2, 1997. In that contract, Oneida again retained Ullman "to provide certain advice and counsel ... in the procurement of crystal products" and, as well, "common glass." (*Id.* Exh. D). Many of the terms and conditions of this contract were taken verbatim from the first contract between Ullmann and Oneida.

The first and third contracts (the procurement contracts) expressly defined the legal nature of the relationship between Oneida and Ullmann. Each provided that "Ullmann will perform these services as an independent contractor and shall not be considered an agent of Oneida. Ullmann will have no authority to conclude contracts on behalf of Oneida or obligate Oneida in any way."

The course of the relationship under these contracts between Oneida and Ullmann is, if one looks only to the contracts, straightforward: from September 15, 1991, to February 28, 1995, Ullmann was to procure crystal for Oneida. From February 28, 1995, to November 2, 1997, Ullmann was to sell Oneida's glassware in Europe. Since November 2,

1997, Ullmann has been retained to procure crystal and common glassware for Oneida.

In practice, however, things were not so distinct. Ullmann, though then under contract only to increase Oneida's European sales, also undertook in 1995 to develop means of "satisfying Oneida's desire to be able to supply common glassware to the United States foodservice industry." (Doc. 86 at 3). This led to discussions between him, Pasabahce, and another glass company, Schott–Zweisel. These discussions, in turn, led to an agreement to form two joint ventures. One, Pasabahce–Schott, would be responsible for manufacturing glassware; the other, Schott–Pasabahce, would market the glassware. Oneida was involved in neither these discussions nor the joint ventures.

The marketing joint venture, Schott–Pasabahce, became Schott–Zweisel/Horeca, Ltd. (Horeca), with Ullmann, as of October, 1996, as its Managing Director. For several months thereafter, Horeca and Pasabahce discussed providing glassware to Oneida, which, in time, gave a purchasing commitment to Horeca. In July, 1997, Ullmann became Managing Director of Schott–Pasabahce, remaining in that position until the Spring of 1998.

The third contract between Oneida and Ullmann, entered into in November, 1997, excluded Ullmann's dealings with Schott–Pasabahce, in view of his status as a Managing Director with that entity. This exclusion appears to have had the effect of taking Oneida's purchases of glassware from Schott–Pasabahce out of the computation of Ullmann's compensation from Oneida. The exclusion was removed from the Ullmann–Oneida contract in September, 1998, about six months after Ullmann had resigned as Schott–Pasabahce's Managing Director. (Doc. 86 Exh. E).

This sequence of events, Oneida contends, shows that at the conclusion of the first contract, Ullmann ceased to be a consultant to Oneida with regard to its purchase of glassware until he resumed that role upon entering into the third contract in November, 1997. Libbey, in response, points to testimony by Mr. Reidpath, Oneida's Executive Director of Marketing, in which he testified that Ullmann was acting "on Oneida's behalf with Schott Pasabahce" and "representing Oneida's interests in those discussions." (Reidpath Dep. 122:3–25).

Based on the record presently before me, and solely for the purpose of deciding the instant discovery disputes, I conclude that from February 28, 1995, until November 2, 1997 (the period of the second contract), Oneida retained Ullmann to serve only as a consultant with regard to sales of Oneida's products in Europe. Although Ullmann concurrently worked to procure glassware from Pasabahce to sell to Oneida and others, he was under no contractual obligation to perform that work for Oneida. Those efforts were, rather, on behalf of the Schott–Pasabahce (Horeca) joint venture. Oneida during this period may well have viewed Ullmann as serving its interests as well, but its contract with him was limited to sales of its products, and did not encompass procurement of products for it to sell to the foodservice industry.

### The Discovery Disputes

The first issue raised by the pending discovery disputes involves Libbey's claim that Oneida has waived its attorney-client privilege with regard to the substance of the advice given to Oneida by its attorneys about the legal consequences of Oneida's purchase of glassware from Pasabahce. One basis for that claim is that certain witnesses produced by Oneida for deposition have, during their depositions, disclosed that advice. A second basis for Libbey's claim that Oneida has waived its attorney-client privilege is that Oneida's employees shared privileged communications with Ullmann and Pasabahce.[1]

---

1. Libbey also argues that, because Oneida will be relying on an "advice of counsel" defense, it cannot assert the attorney-client privilege during pretrial discovery. Oneida has represented that it will rely on such defense, if at all, only during the damages phase of this case, which will be tried, if necessary, only after the liability phase. In light of that representation, Libbey's claim that Oneida's anticipated use of that defense waives its ability to claim the attorney-client privilege during liability-phase discovery is moot.

In addition, Libbey seeks to procure the deposition of Mr. Ullmann under Fed. R.Civ.P. 30(b)(1).

## A. Attorney–Client Privilege Issues

### 1. Waiver by Deponents

Libbey claims that testimony by Decker Reidpath, Oneida's Executive Director of Marketing, that Oneida's lawyers gave the "green light" to the manufacture by Pasabahce and purchase by Oneida of the glassware at issue in this case waived the attorney-client privilege as to all attorney-client communications relating to that transaction. Waiver also resulted, according to Libbey, when Michael McGrogan, Oneida's Director of Foodservice Sales, testified that Oneida "had come as close as possible to the appearance of Libbey's [glasses] without copying" because of "the legal ramifications of copying."

Unquestionably, "[b]y voluntarily disclosing her attorney's advice to a third party ... a client is held to have waived the attorney-client privilege because the disclosure runs counter to the notion of confidentiality." *In re Grand Jury Proceedings,* 78 F.3d 251, 254 (6th Cir.1996). The question here is whether the testimony by Oneida's witnesses about the "green light" and "legal ramifications of copying" disclosed attorney-client communications.

Courts have perceived a difference between an opaque reference to an attorney's advice and disclosure that illuminates the facts and analysis underlying that advice. In *In re Dayco Corp. Derivative Securities Litigation,* 99 F.R.D. 616, 618 (S.D.Ohio 1983), for example, a litigant had retained a law firm to examine matters and events leading to litigation. Thereafter, a two-page press release summarizing the firm's "findings" and "conclusions" was issued. Because "neither the facts which led to those conclusions, nor the Report itself, were released," the court held that the privilege had not been waived.

Similarly, in *In re Brand Name Prescription Drugs Antitrust Litigation,* No. 94C897 MDL 997, 1995 WL 531805 at *1–2 (N.D.Ill. Aug. 8, 1995), the privilege was not waived, despite a witness's testimony that "[w]e had antitrust counsel at the major meetings where we discussed this, and the guidance we were given is that in no way can this discussion include any discussion of future impact or present impact." Because the "statements reveal[ed] nothing substantive about attorney-client communications, other than counsel's direction to comply with the law generally," waiver had not occurred. *Id.; see also United States v. White,* 887 F.2d 267, 271 (D.C.Cir.1989) ("Where a defendant neither reveals substantive information, nor prejudices the government's case, nor misleads a court by relying on an incomplete disclosure, fairness and consistency do not require the inference of waiver"); *United States v. Jackson,* 969 F.Supp. 881, 883 (S.D.N.Y.1997) (defendant who stated that he had phoned an attorney "in an attempt to determine if what [he and his co-defendant] were doing was legal ... did not disclose the underlying statements to which he alluded [and] ... did not make any statement revealing the substance of his remarks and questions to the lawyer").

That the Sixth Circuit would be likely to adopt this view is apparent from its discussion of *White* and *Dayco* in *Grand Jury Proceedings,* 78 F.3d at 254. In *Grand Jury Proceedings,* the court, finding a waiver of the privilege, stated that, "[u]nlike the litigants in *White* and *Dayco,* the owner and president of the laboratory did discuss the substance of their attorney's advice.... The information the owner and president gave to the investigators revealed their attorney's legal conclusions and the facts on which those conclusions were based ... and the reasoning behind the conclusion." *Id.; see also In re Perrigo Co.,* 128 F.3d 430, 438 (6th Cir. 1997) ("This circuit has found that a corporation's submission of portions of a report does not waive the attorney-client privilege if the report is not released in 'significant part' ") (*citing Grand Jury Proceedings*).

The passing allusions extracted in this case during depositions by opposing counsel did not disclose the substance of communications between Oneida counsel and the deponents. There is no basis, accordingly, for finding

that this testimony resulted in a waiver of the attorney-client privilege.

### 2. Transmittal of Attorney–Client Communications to Ullmann and Pasabahce

From materials produced thus far in this lawsuit, it appears that Oneida, Pasabahce, and Ullmann had concerns about the legal implications of similarities in appearance between the glassware to be provided to Oneida by Pasabahce and lines of glassware produced by Libbey. Discussion about these concerns led Oneida employees to disclose to Pasabahce and Ullmann materials and information obtained from Oneida's counsel.

Neither Ullmann nor the Pasabahce employees had counsel. It does not appear that either Ullmann or Pasabahce's employees understood the significance the communications' privileged status or the potential consequences to Oneida of disclosure to them or, if such disclosure were to occur, to others.

Voluntary disclosure of an attorney's advice to a third party ordinarily results in waiver of the attorney-client privilege. *Grand Jury Proceedings,* 78 F.3d at 255. To overcome this general rule, Oneida argues that no waiver occurred because it, Pasabahce, and Ullmann had a common interest in the legal implications of the agreements that they were negotiating at the time of the disclosure.

To encourage sharing of information when such disclosure enhances, rather than undercuts, the policies underlying the attorney-client privilege, the law in some limited circumstances allows communications to remain privileged even after disclosure to third parties. These circumstances include: a) "joint client," b) "joint litigant," and c) "common interest" relationships. Each of these relationships has its unique attributes. James M. Fischer, *The Attorney Client Privilege Meets Common Interest Arrangement,* 16 Rev. Litig. 631, 634 (Summer 1997).

▪ Where more than one client is using the services of the same attorney, the "joint client" privilege protects communications between the several clients and their common lawyer. *Id.* Where several parties, though represented by separate counsel, are

on the same side of a legal dispute and share information for their mutual benefit in that dispute, the "joint litigant" privilege protects "attorney-client privileged matters when they are shared with co-parties, even though those parties are represented by separate counsel." *Id.*

With either the joint client or the joint litigant situation, the risks to the confidentiality of the shared communications usually are minimal. Where the same lawyer serves more than one client, he or she can take whatever steps seem appropriate to warn the clients about the need to protect the confidence of their communications. The joint litigant arrangement, which has become a commonplace feature of multi-defendant criminal cases, *see* Deborah Stavile Bartel, *Reconceptualizing the Joint Defense Doctrine,* 65 Fordham L.Rev. 871, 881 (1996), is, moreover, often accompanied by formal agreement on the part of all participants not to disclose any of the shared privileged information to any outsiders. Paul L. Perito, et al., *Joint Defense Agreements,* 4 Crim. Just. 6, 39 (Winter 1990).

In both the joint client and joint litigant situations confidential information leaves its concealed confines. Nonetheless, barriers against further exposure to the view of others can be as high and tight, or nearly so, as they are with the conventional one-client, one-lawyer relationship. Parties giving and receiving the information can agree not to share it further. Any remaining risk of leakage is worth the benefits to the clients employing common counsel or pooling. In either situation, moreover, the policy favoring effective communication with counsel is furthered because all parties have either the same counsel or their own lawyers.

▪ The "common interest" arrangement permits the disclosure of a privileged communication without waiving the privilege, provided the parties have "an identical legal interest with respect to the subject matter of the communication." *Duplan Corp. v. Deering Milliken,* 397 F.Supp. 1146, 1164 (D.S.C. 1974). In theory, the common interest doctrine encourages parties working with a common purpose to benefit from the guidance of

counsel, and thus avoid pitfalls that otherwise might impair their progress toward their shared objective.

Two lines of cases reflect differing views about the common interest arrangement. The more expansive view is expressed in *Hewlett–Packard v. Bausch & Lomb*, 115 F.R.D. 308, 309–11 (N.D.Cal.1987). In that case, the court held that no waiver of the attorney-client privilege occurred when a patent owner, who was seeking to sell one of its divisions, disclosed its patent attorney's opinion letter to the prospective purchaser. *Id.* at 312.

■ The narrower view of the common interest doctrine, as expressed in *Bank Brussels Lambert v. Credit Lyonnais*, 160 F.R.D. 437, 447 (S.D.N.Y.1995) (emphasis supplied), is that confidential communications can be shared only if both parties have more than "merely *concurrent* legal interests." Instead, the parties must have "a *common legal,* as opposed to commercial, interest." *Id.* at 447 (emphasis supplied). Thus, the parties must show that the disclosures are made in the course of "formulating a *common legal strategy.*" *Id.* (emphasis supplied).

■ Under this approach, communications shared during a business undertaking lose their privileged status, even though such sharing helped address or ameliorate bona fide concerns about the legal implications of some aspect of the business venture. As stated in *Bank Brussels*, "the common interest doctrine does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation." *Id.* *Accord Walsh v. Northrop Grumman Corp.*, 165 F.R.D. 16, 19 (E.D.N.Y.1996) (noting that a "concern about litigation ... does not transform [the parties'] common interest and enterprise into a legal, as opposed to commercial matter"); *Oak Industries v. Zenith Industries*, No. 86C4302, 1988 WL 79614 at *4 (N.D.Ill. July 27, 1988) (declining "to expand the coverage of the attorney-client privilege to information which a party freely shares with other business persons"); *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 512 (D.Conn.1976) (finding no common interest where disclosures were part of adversary business negotiations rather than the advancement of a "joint interest vis-a-vis the rest of the world").

■ Before choosing one approach to the "common interest" exception over another, consideration should be given to some practical aspects of disclosures sought to be protected due to the common interest of the parties.

Sharing of legal advice may well increase the usefulness of that advice. But that does not necessarily mean that the policy of favoring consultation with counsel has been implemented. Where, as here, only Oneida involved an attorney directly, Pasabahce can hardly have been said to have "consulted" with counsel, or obtained the benefit of advice from a lawyer responsible to it alone. Because, in this instance, only one participant used the services of counsel, the policy of gaining prior legal advice was only partially fulfilled.

In addition, no steps appear to have been taken by Oneida's lawyers and its employees, or Ullmann or Pasabahce, to ensure that the privileged communications, though shared, would remain confidential. There is no indication that either Ullmann or Pasabahce (or, for that matter, Oneida's own employees) understood the need to guard attentively against further disclosure if the privilege were to be retained.

By refusing to extend the common interest privilege to situations where no efforts were taken to acknowledge and protect the privileged status of the shared communications, courts make privilege law more predictable. In an area as presently uncertain as this, disputes of the sort now before me would not arise if all parties were required either to involve their own lawyers, or to take some other deliberate and meaningful steps to protect the confidential nature of the communications. By disallowing claims of common interest absent clear indication that the parties sought actively to keep the communications confidential, courts can create a benchmark for parties with common legal interests to enjoy the benefits of shared legal advice.

Clients must understand that legal information is like other types of proprietary information. Any sharing risks waiver of the privilege, and should occur under only certain specified conditions. Those conditions ensure that the information will not be disclosed beyond its use to serve the common legal interest. A court should not base its determination of whether the common interest doctrine is applicable on whether or not such further disclosure occurred. To do so would lead to protracted litigation. The burden belongs on the party claiming privilege to have avoided uncertainty, and to have taken effective steps to ensure that all participants were aware of the need to maintain confidentiality, and to show that mechanisms were in place to accomplish that objective before the information was shared.

The restrictive approach of *Bank Brussels* accommodates the objective of continued confidentiality more effectively than the expansive, unrestricted approach of *Hewlett–Packard.* By limiting the opportunity to claim the common interest privilege, courts encourage parties to take effective steps in advance to acknowledge the privilege and implement the policies it fosters. This approach lends greater predictability to the law and implements the requirement of construing the attorney-client privilege narrowly. *Grand Jury Proceedings,* 78 F.3d at 254.

Here the parties took no steps to safeguard the privilege. On that basis alone, I find it to have been waived.

In any event, even if steps had been taken to avoid further disclosure, I find in the alternative that the communications were ancillary to the principal activity in which Oneida, Ullmann, and Pasabahce were engaged: namely, the negotiation of an agreement for Pasabahce to make and for Oneida to buy and distribute glassware to compete with Libbey. All parties apprehended that their venture involved some legal risk, but that apprehension was merely a part of their larger endeavor. Responding to those concerns on the part of the other parties, Oneida sought commercial gain, not legal advantage, through disclosure of its lawyer's advice to Ullmann and Pasabahce. The parties were formulating not a "common legal" strategy, but a joint commercial venture. *Bank Brussels* at 447.

Oneida's claim of privilege as to legal materials shared with either Ullmann or Pasabahce is, accordingly, without merit.[2]

## B. Rule 30(b)(1) "Managing Agent"

The deposition of a corporation may be taken by noticing the deposition of the corporation by a particular officer, director, or managing agent pursuant to Fed. R. Civ. P. 30(b)(1). It is not permissible to notice the deposition of a corporation by a person who is not an officer, director or managing agent. Libbey has noticed Ullmann's deposition, contending that he is a "managing agent" of Oneida. Oneida contends that Ullman is not one of its managing agents and thus cannot be compelled to appear for deposition under Fed.R.Civ.P. 30(b).

As stated in *Founding Church of Scientology of Washington, D.C., Inc. v. Webster,* 802 F.2d 1448, 1452 (D.C.Cir.1986), "[t]he law concerning who may properly be designated as a managing agent is sketchy. Largely because of the vast variety of factual circumstances to which the concept must be applied, the standard, like so many others in the law, remains a functional one to be determined largely on a case-by-case basis." Courts are, however, "in general agreement that the term[ ] Managing Agent ... should not be given too literal an interpretation, and that applications thereunder should be treated and determined on an ad hoc basis ...." *Kolb v. A.H. Bull Steamship Co.,* 31 F.R.D. 252, 254 (E.D.N.Y.1962).

---

**2.** As a result of this ruling, Oneida must produce all communications in which it shared otherwise privileged information with either Ullmann or Pasabahce. In addition, it must produce all communications relating to the same "subject matter." *United States v. Skeddle,* 989 F.Supp. 905, 908 n. 2 (N.D.Ohio 1997). I anticipate that the parties will not agree about the scope of the "same subject matter." If not, Oneida shall, within one week of the date of this opinion, file copies of all the materials being provided to Libbey in accordance with this order, along with its brief regarding its definition of the "same subject matter." Libbey shall file its response within one week thereafter.

A frequently repeated set of factors for determining whether the deponent is a managing agent was enunciated in *Krauss v. Erie R. Co.*, 16 F.R.D. 126, 127 (S.D.N.Y.1954) (footnotes omitted):

> A managing agent, as distinguished from one who is merely 'an employee' is a person invested by the corporation with general powers to exercise his judgment and discretion in dealing with corporate matters; he does not act 'in an inferior capacity' under close supervision or direction of 'superior authority.' He must be a person who has 'the interests of the corporation so close to his heart that he could be depended upon to carry out his employer's direction to give testimony at the demand of a party engaged in litigation with the employer.'

In *Newark Ins. Co. v. Sartain*, 20 F.R.D. 583, 586 (N.D.Cal.1957), the court stated that, in its view, "the latter test [i.e., the deponent's inherent loyalty] is the paramount and perhaps the really determinative one . . . ." Although this statement has frequently been repeated, *see, e.g., In re Honda American Motor Co., Inc. Dealership Relations Litigation*, 168 F.R.D. 535, 540 (D.Md. 1996), I believe that it overstates the role of a deponent's identity with or apparent fidelity to the principal's interests, because it would it apply to many agents and employees who do not function with that degree of authority over a company's affairs connoted by the term "managing" agent.

Moreover, the emphasis placed by *Newark Insurance* on the deponent's presumed loyalty to his principal derived from the court's concern in that case that it would be "unfair for a litigant to be unable to secure the testimony of a ranking employee of his adversary, in the form of a managing agent, in possession of pertinent information (short of calling him as his own witness and thereby vouching for his veracity), when it is clear that such person is a supporter of his principal's cause and will give his testimony in the light most favorable to the principal." *Id.* at 25. This concern, and thus this rationale for giving extra weight to a deponent's presumed loyalty to his or her principal, has been eliminated by Fed.R.Evid. 607.

In *Church of Scientology* and *Kolb*, in contrast, the courts emphasized the nature of the deponent's activities on behalf of the corporation, rather than his loyalty to its interests. Thus, in *Church of Scientology* the court stated:

> For the purpose of determining whether an individual is a "managing agent" within the meaning of the discovery rules, the alter ego theory provides a useful analogy. As in the arena of corporate liability, the focus begins with the character of the individual's control. In addition, we can profitably examine both the degree to which the interests of the individual and the corporation converge, and how helpful the individual will be in factfinding on the matter at issue, in comparison to others associated with the corporation. As in all matters appertaining to discovery, it is the ends of justice that are to be served.

802 F.2d at 1453.

■ Similarly, in *Kolb*, the court stated that whether the proposed deponent was a managing agent was "dependent largely on the functions, responsibilities and authority of the individual involved respecting the subject matter of the litigation." 31 F.R.D. at 254. Thus, "[w]hether a proposed deponent falls into a particular category of employees or agents is therefore less relevant than the individual's specific functions and authority." *United States v. Afram*, 159 F.R.D. 408, 413 (S.D.N.Y.1994). *Accord, Sugarhill Records Ltd. v. Motown Record Corp.*, 105 F.R.D. 166, 170 (S.D.N.Y.1985); *Tomingas v. Douglas Aircraft Co.*, 45 F.R.D. 94, 96 (S.D.N.Y. 1968); *General Tire Inc. v. Broad Elm Auto Ctrs. of Niagara Falls, Inc.*, No. 94–CV–960A, 1997 WL 929823 (W.D.N.Y. Apr. 18, 1997). In light of this line of cases, at least equal, if not greater weight should be given to what the deponent did for the corporation than to the other factors stated in *Krauss*.

■ In any event, it is clear that the deponent need not have a formal association with the corporation to be deemed to be its managing agent. *Petition of Manor Investment Co.*, 43 F.R.D. 299, 300 (S.D.N.Y.1967) (deponent did not hold any office or formal position in the corporation, but he controlled

its affairs, performing functions "of a supervisory nature" related to the activities in question). Likewise, the deponent need not be associated with the corporation at the time of his deposition. *Independent Productions Corp. v. Loew's, Inc.*, 24 F.R.D. 19, 24–25 (S.D.N.Y.1959).

■ Applying the standard for determining who is a "managing agent" as stated in *Krauss* and refined in *Church of Scientology* and *Kolb*, I conclude that Ullmann is not a managing agent under Rule 30(b)(1). Although he may well have played an important role in the creation of the Oneida–Pasabahce contract, he was under no contractual obligation to do so. Instead, at the time of the principal events giving rise to this lawsuit, he had been retained by Oneida to develop its European market. Though he later returned to his former relationship as a consultant for purposes of procuring glassware, including the common glassware at issue here, that was not his formal status when he helped to broker the Oneida–Pasabahce agreement.

Even if Ullmann were acting de facto as Oneida's agent, he did not exercise control over the terms, conditions, and formation of the Oneida–Pasabahce agreement. Even when he was performing as Oneida's procurement representative, he did not have authority to enter into contracts on Oneida's behalf. His activities were those of a subordinate, not a person acting with substantially unfettered discretion and power.

There can be little doubt that Ullmann had Oneida's interests "close to his heart." But, as noted, to the extent that other courts give this factor primary weight, I decline to do so. It makes better sense to look to what he was doing than what he might have felt about Oneida to determine whether he is subject to Rule 30(b)(1).

Because, as noted in *General Tire*, at *2, "determination of whether an individual is a managing agent in any given case is fact-sensitive," few cases are likely to present substantially similar factual circumstances. That case, however, comes close.

In *General Tire*, the defendant submitted an affidavit describing the duties of the proposed deponents:

> the individuals sought to be deposed are "field sales representatives" which act as "liaisons between the dealers and [the plaintiff]," and that these employees are not authorized to negotiate contracts with dealers, to renegotiate contracts with existing dealers, to negotiate with dealers concerning pricing, to enter into agreements with dealers to provide the dealers with funds or sales incentives, to negotiate with dealers concerning amounts the dealer may owe the plaintiff, to negotiate lease terms or to agree that the plaintiff will provide the dealer with credit, to bind the plaintiff by contract, or to exercise judgment in corporate matters.

The field sales representatives only purportedly acted as a "conduit for communications between [the plaintiff] and its dealers, i.e. to provide training and information to the dealers about [the plaintiff's] products and promotions and to provide [the plaintiff] with feedback concerning its dealers and products." *Id.* at *2–3.

This relationship resembles in its most important aspects the relationship between Ullmann and Oneida. Ullmann worked outside Oneida's offices, and acted as a liaison between Oneida and Pasabahce. He had no authority to enter into contracts. His efforts facilitated, but did not control, the process leading to the Oneida–Pasabahce contract. At all times, he was subordinate to Oneida, and not able to exercise independent discretion.

In light of the foregoing, Ullmann is not subject to being deposed as a managing agent.[3]

### Conclusion

In light of the foregoing, it is

---

**3.** Ullmann and Oneida appear to have a continuing contractual relationship, which includes provision for a substantial commission to be paid to Ullmann for sales to Oneida of glassware for which he is responsible. It appears highly unlikely that, if Oneida asked him to appear as a witness in this case, he would decline to do so. Although Ullmann's appearance for a deposition cannot be compelled, his appearance as a witness will not be allowed unless at least four weeks prior to trial he is produced, at Libbey's expense, by Oneida for deposition.

**ORDERED THAT**

1. Defendant Oneida shall within one week of the date of this order provide copies of all documents containing communications with Norbert Ullmann or Pasabahce, as to which Oneida previously has asserted the attorney-client privilege;

2. If the parties dispute the scope of the "same subject matter" re. the materials to be produced pursuant to this order, copies of documents and briefs to be filed as provided herein; and

3. Notice to depose Norbert Ullmann pursuant to Fed.R.Civ.P. 30(b)(6) be, and the same hereby is quashed.

**So ordered.**